1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF WISCONSIN
2  _____

3  JOSHUA J. BELOW, by his Guardian,
   DEBRA BELOW, CHARLIE ELIZABETH
4  BELOW and PATRICK JOSHUA BELOW, et al,

5          Plaintiffs,

6      and

7  DEAN HEALTH PLAN, INC.,

8          Involuntary Plaintiff,

9      and

10 STAR BLUE BELOW-KOPF, by her Guardian
   ad Litem, Teresa K. Kobelt,

11
          Intervening Plaintiff,
12
      vs.                        C.A. NO. 3:15-CV-00529
13
   YOKOHAMA TIRE CORPORATION, ABC
14 INSURANCE COMPANY, YOKOHAMA
   CORPORATION OF AMERICA, DEF INSURANCE
15 COMPANY, YOKOHAMA CORPORATION OF
   NORTH AMERICA, GHI INSURANCE COMPANY,
16 YOKOHAMA TIRE MANUFACTURING VIRGINIA,
   LLC, JKL INSURANCE COMPANY, YOKOHAMA
17 RUBBER COMPANY, LTD, and MNO INSURANCE
   COMPANY,
18
          Defendants.
19 _____

20
      VIDEO DEPOSITION:  DENNIS D. SKOGEN, MSME
21
              DATE/TIME:  October 13, 2016 - 9:05 a.m.
22
               LOCATION:  HABUSH, HABUSH & ROTTIER, S.C.
23                        150 East Gilman Street, #2000
                          Madison, Wisconsin 53703
24

25 Job Number: 343546

DENNIS D.  SKOGEN, MSME – 10/13/2016

```
1                A-P-P-E-A-R-A-N-C-E-S
2    HABUSH, HABUSH & ROTTIER, S.C., by
     CHRISTOPHER ROGERS, ATTORNEY-AT-LAW
3    150 East Gilman Street, Suite 2000
     Madison, Wisconsin 53703
4    appeared on behalf of the Plaintiffs
5    JOHNSON, TRENT, WEST & TAYLOR, LLP, by
     RAPHAEL TAYLOR, ATTORNEY-AT-LAW
6    919 Milam, Suite 1700
     Houston, Texas 77002
7    appeared on behalf of the Defendants
8    KASDORF, LEWIS & SWIETLIK, S.C., by
     JAMES J. KRIVA, ATTORNEY-AT-LAW
9    11270 West Park Place, 5th Floor
     Milwaukee, Wisconsin 53224
10   appeared on behalf of the Defendants
11   VIDEOGRAPHER:  Marco Santilli
12                    * * * * *
13     TRANSCRIPT INDEX  -  DENNIS D. SKOGEN, MSME
14   -------------------------------------------------
15   EXAMINATION BY                      PAGE NO.
16   Mr. Taylor                           5
     Mr. Rogers                         152
17   Mr. Taylor                         152
18   -------------------------------------------------
19   EXHIBITS     DESCRIPTION           PAGE MARKED
20   Exhibit 25  Notice of Deposition Duces  28
                 Tecum
21
     Exhibit 26  2/29/16 accident analysis    32
22               report (SKO0660-077)
23   Exhibit 27  Skogen invoices to Rottier   34
                 (SKO003-010)
24
     Exhibit 28  Skogen CV (SKO001-002)       40
25
```

```
1    Exhibit 29  Indexed deposition of Scott   41
                 Stoffel
2
     Exhibit 30  Indexed deposition of Chad    42
3                Thompson
4    Exhibit 31  Rule 26 list                 42
5    Exhibit 32  CD, inspection photos        44
                 1-336 (SKO011)
6
     Exhibit 33  File, Google Street View     45
7                (SKO129-135)
8    Exhibit 34  File, calculations           46
                 (SKO136-137)
9
     Exhibit 35  File, inspection notes       47
10               (SKO138-149)
11   Exhibit 36  Skogen scale drawing         49
                 (SKO078)
12
     Exhibit 37  9/15/16 letter to Skogen     65
13               from Munson with Jessen
                 statement
14
     Exhibit 38  File, vehicle                 
15               specifications (SKO079-081)
16   -------------------------------------------------
17   REQUESTED DOCUMENTATION            PAGE NO.
18     None
19   -------------------------------------------------
20   NOTE: Original transcript provided to Mr. Taylor.
            Original exhibits returned to Mr. Skogen,
21          with copies provided as requested by the
            reporter.
22
23
24
25
```

```
1                P-R-O-C-E-E-D-I-N-G-S
2        THE VIDEOGRAPHER:  This is the
3    beginning of disk No. 1 in the deposition of
4    Dennis Skogen in the matter of Below, et al,
5    versus Yokohama Tire Corporation, et al, held
6    at the offices of Habush, Habush & Rottier
7    located at 150 East Gilman Street in Madison,
8    Wisconsin.  Today's date is Thursday, October
9    13th, 2016, at 9:05 a.m.
10       The court reporter is Doreen
11   Brown-Schwager.  I am Marco Santilli, the
12   videographer, on behalf of Litigation
13   Services.
14       This deposition is being videotaped at
15   all times unless specified to go off the
16   record -- off the video record.
17       Would all present please identify
18   themselves, beginning with the witness?
19       THE WITNESS:  My name is Dennis
20   Skogen.
21       MR. TAYLOR:  My name is Rafe Taylor.
22   I'm here for the Yokohama entities.
23       MR. ROGERS:  My name is Christopher
24   Rogers of the Habush firm.  I'm here for Joshua
25   J. Below, by his guardian, Deb Below, Charlie
```

```
1        Elizabeth and Patrick Joshua Below.
2        MR. KRIVA:  Jim Kriva of Kasdorf,
3    Lewis & Swietlik, co-counsel for Yokohama Tire
4    Company, et al, Defendants.
5        THE VIDEOGRAPHER:  Will the court
6    reporter please swear in the witness?
7        WHEREUPON, DENNIS D. SKOGEN, being
8    first duly sworn, was examined as follows:
9                E-X-A-M-I-N-A-T-I-O-N
10   BY MR. TAYLOR:
11   Q.  Would you state your full name for the record,
12       please?
13   A.  Yes.  My name is Dennis Skogen.
14   Q.  Mr. Skogen, my name is Rafe Taylor, and I
15       represent the Yokohama entities that have been
16       sued by Mr. Below and his family.  Do you
17       understand that?
18   A.  I do.
19   Q.  Have you agreed to serve as an expert witness
20       on behalf of the Belows?
21   A.  Yes, I have.
22   Q.  I understand from looking at your curriculum
23       vitae that you are familiar with the deposition
24       process?
25   A.  Yes.
```

DENNIS D.   SKOGEN, MSME – 10/13/2016

1  Q.  **Do you need me to go through the ground rules**
2      **with you?**
3  A.  No.
4  Q.  **Fair enough.**
5          **Looking at your Rule 26 list, it**
6      **appears that you do at least ten to 12**
7      **depositions or trial appearances per year at**
8      **least out of the last three or four years, is**
9      **that correct?**
10 A.  Yes.
11 Q.  **Somewhere in your report, you indicated that**
12     **you investigated at least 8,000 different**
13     **accidents in your career, is that right?**
14 A.  Yes.
15 Q.  **And not all of those have been automobile**
16     **accidents, is that correct?**
17 A.  You are correct.
18 Q.  **Can you give us an idea or a percentage of the**
19     **work that you've done in your 46-year career**
20     **that would include automobile accidents?**
21 A.  When I originally started in 1970, most of the
22     work I did involved automobile accidents.  So
23     that would be a high percentage.  But then
24     clients would ask me to analyze accidents
25     involving farm machinery and other kinds of

1      equipment over the years.
2          Currently I suppose it's not quite 50
3      percent motor vehicle accidents, and the rest
4      would be other types of accidents.
5  Q.  **What are the other types of accidents?**
6  A.  As a mechanical engineer, I've analyzed
7      accidents involving machinery.  That machinery
8      would be industrial machinery and agricultural
9      machinery and sometimes other types of
10     accidents or incidents.
11         And so if you want me to go through
12     the categories or name the kinds of machinery
13     in agriculture or industry that I've analyzed,
14     I can certainly do so.
15 Q.  **What would those be?**
16 A.  Yes.  If we start with agricultural accidents,
17     and knowing that I was raised on a farm, I've
18     had to -- I've been called upon to analyze
19     accidents involving agricultural tractors,
20     implements, including forage wagons, manure
21     spreaders, farm elevators.  Then farmstead
22     equipment involving silo unloaders, silo
23     fillers, barn cleaners.
24         There have been a number of accidents
25     involving power takeoff, questions about how

1      power takeoffs work and how people became
2      injured when they contacted the power
3      takeoffs.
4          I've had cases involving the
5      performance of -- especially related to safety
6      of various types of agricultural equipment,
7      including skid-steer loaders, other pieces of
8      equipment that would be used in the farmstead
9      that wouldn't fall directly within those
10     parameters.
11 Q.  **In the last four years, how many times have you**
12     **investigated a single-vehicle accident?**
13 A.  I never kept track.  I don't know.  Last four
14     years?  Maybe five or six a year.  I don't have
15     a number that I can give you at all.
16 Q.  **Interestingly you put your date of birth on**
17     **your curriculum vitae.  It's December 22nd,**
18     **1945, correct?**
19 A.  Yes.  I did put it there.
20 Q.  **And it is December 22nd, 1945?**
21 A.  Yes.
22 Q.  **And so you're 71?**
23 A.  No.  I'll be 71 December 22nd.
24 Q.  **It's coming up?**
25 A.  Yes.

1  Q.  **You're a licensed engineer in Wisconsin?**
2  A.  Yes.
3  Q.  **Any other states?**
4  A.  I'm not currently in any other states licensed
5      as a professional engineer.
6  Q.  **Have you been before?**
7  A.  Yes.
8  Q.  **Where else?**
9  A.  In Iowa and Alabama.
10 Q.  **In Iowa, did you allow that license to lapse,**
11     **or was it for some reason suspended or**
12     **revoked?**
13 A.  No.  It wasn't suspended or revoked.  I stopped
14     paying the fees basically.
15 Q.  **Fair enough.**
16         **In Alabama, was that license suspended**
17     **or revoked?**
18 A.  No.  It was not suspended or revoked.
19 Q.  **Has your license in Wisconsin ever been**
20     **suspended or revoked?**
21 A.  No, sir.
22 Q.  **You mentioned you hold a mechanical engineering**
23     **degree?**
24 A.  I do.
25 Q.  **And that's a Bachelor of Science level degree,**

DENNIS D.   SKOGEN, MSME - 10/13/2016

1     correct?
2  A.  And master's degree in both.
3  Q.  Right.  You started your master's in 1970 and
4     completed it in 1986?
5  A.  Correct.
6  Q.  Do you hold any other certificates or degrees?
7  A.  No.
8  Q.  You've been serving as an accident
9     reconstructionist on some level, whether it be
10    automobile, farm equipment or otherwise, for
11    about 46 years, is that right?
12  A.  True.
13  Q.  By whom were you retained?
14  A.  In this matter, we were originally contacted by
15    Mr. Rottier.
16  Q.  My understanding is the date of the accident
17    involving Mr. Below was September the 14th,
18    2013, is that right?
19  A.  Yes.
20  Q.  And you had your first contact with Dan Rottier
21    on October the 13th, 2013, is that right?
22  A.  October the 30th, yes.
23  Q.  October 30th?
24  A.  Yes.  Let me look at my new case outline which
25    would be in the file, and it's previously been

1     marked with a Bates number.
2  Q.  Sure.  I may have just written it down wrong.
3  A.  I know it's contained in the materials, so give
4    me just a moment to find it.
5  Q.  Sure.  I think it's in your report actually.
6  A.  Yes.  I have that down as September 30th -- or
7    pardon me.  October 30th, 2013.
8  Q.  Well, let's go with that day for now.
9  A.  That's fine.
10  Q.  Roughly six weeks after the accident you were
11    contacted by Mr. Rottier about this case?
12  A.  Yes, sir.
13  Q.  What were you told your role would be in this
14    case?
15  A.  I'm not sure we were told a role per se.  It
16    was my understanding that we were to open a
17    file, and as we do so many times to preserve
18    evidence, in other words, to review information
19    that was provided to us and that we gathered
20    ourselves to be in a position so that we could
21    subsequently reconstruct the accident, if
22    needed.
23  Q.  So you were not initially hired to reconstruct
24    the accident?
25  A.  Oh, that's inferred, but it wasn't so

1     stated.
2  Q.  Okay.  Certainly you understood that at some
3    point you would be reconstructing this accident
4    when you were hired?
5  A.  Potentially, yes.
6        So you understand, many times we're
7    contacted to preserve evidence, to gather
8    evidence, and then to hold the evidence in case
9    there's something that -- a matter that
10    proceeds.  And then later we may be asked to
11    reconstruct the accident.
12  Q.  When did your understanding go from an
13    inference to a directive that you would be
14    reconstructing the accident?
15  A.  I would say within a year or two after that
16    time, after we were initially contacted.
17  Q.  You're thumbing through your file.  Are you
18    looking for a specific set of notes that would
19    answer that question more directly?
20  A.  I'm still looking for the new case outline.
21  Q.  Do you want to take a second and see if you can
22    can find it?
23  A.  Yes, sir.
24  Q.  See if it would help you with some of these
25    questions?

1  A.  Depends upon where it is in the stack, but it's
2    a document that's filled out when we're first
3    retained, and it gives the name of the
4    contacting party, the names of the people
5    involved, the date of the accident, and the
6    name of the contacting party and when they
7    contacted us.
8  Q.  I can tell you that I don't think I've actually
9    seen that document.
10  A.  It's been previously numbered as 92, Bates 92,
11    because I found it.
12  Q.  Fantastic.
13  A.  And we were contacted by Mr. Rottier on
14    October 30th, 2013, and as I said, the date of
15    the accident was given along with the name of
16    the involved driver, Mr. Below.
17  Q.  May I see that document?
18  A.  You certainly may.
19  Q.  Thank you.
20        Did you have the conversation with
21    Mr. Rottier on December 30th, 2013?
22  A.  I may have.  I don't recall doing so.
23  Q.  Can you tell from that document?
24  A.  I couldn't tell either way, because I don't
25    make notes when we have it generated.

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 14

1    Exhibit 92, when there's a call to our
2    office, my assistant, Mary Stoflet, types up
3    Exhibit 92.
4  Q.   Sure.
5  A.   So I -- Usually I talk to people at that time,
6    but I may not have been available.  I simply
7    don't recall talking or not talking with
8    Mr. Rottier at that time.
9  Q.   What would have that call spurred in your
10   office?  In other words, what chain of events
11   would that have set in motion?
12 A.   What happens is we open a file, and we have the
13   name of the driver, so if we're contacted by
14   someone else we would have a conflict of
15   interest.  And then we wait for information
16   from the client, such as receiving police
17   reports and photographs and other information
18   which is sent to us.
19 Q.   Do you have something in your file that
20   indicates when the next point in time was that
21   you received information from Mr. Rottier's
22   office?
23 A.   I don't know if there's a sequential way to
24   determine that, because sometimes materials are
25   delivered to us in person.  Sometimes, such as

Page 15

1    the August 5th, 2014 letter from Mr. Jarvis,
2    which came by UPS, delivered the CD of
3    photographs taken at the accident scene.
4    That may be the next contact, but I can't be
5    certain whether there was a phone call or
6    some other information that was provided in
7    person.
8         And that's the best answer I can
9    give.
10 Q.   During that phone call that -- Strike that.
11   During that initial phone call from
12   Mr. Rottier, would someone in your office have
13   inquired as to the availability of the subject
14   vehicle?
15 A.   Not necessarily, no.
16 Q.   Why not?
17 A.   Because we wait for information to come from
18   the -- the client as to -- we usually like to
19   have a police report so we can check the names,
20   and then photographs of the scene.  And then
21   depending what the assignment is, we may
22   inspect the vehicle and an inquiry would be
23   made at that time.
24 Q.   And certainly you account for your time by
25   billing your time to your clients such as

Page 16

1    Mr. Rottier, is that correct?
2  A.   Optimistically so.  I try to, yes.
3  Q.   That's how you get paid, right?
4  A.   Well, the company gets paid by the hour, yes.
5  Q.   Sure.  And can you tell by your billing
6    records, was that August 5th, 2014 the next
7    billing entry after the file was opened up?
8  A.   It appears to be so, yes.
9  Q.   You would certainly expect anyone in your
10   office with the ability to capture time to do
11   so when they receive something on a file,
12   wouldn't you?
13 A.   Well again, optimistically so, but I know it
14   doesn't always happen.
15 Q.   Believe me, you're preaching to the choir right
16   now.  I understand.
17        Ultimately I'm assuming sometime then
18   after August the 5th of 2014, you were
19   instructed to do a reconstruction of this
20   accident?
21 A.   To inspect and survey the accident, yes.
22 Q.   Uh-huh.
23 A.   And then that's implied as it would have been
24   during the first contact that there may be a
25   time for a reconstruction at a later date.

Page 17

1  Q.   What did your group do to preserve the evidence
2    between your initial contact on October 30th,
3    2013 and your subsequent contact on August the
4    5th of 2014 for Mr. Rottier's office?
5  A.   I don't recall us doing anything of that
6    nature.  We didn't survey the site or inspect
7    anything prior to that site inspection.
8  Q.   And pardon me, but I thought what you told us
9    was your role was -- after you opened the file,
10   one of your roles was to preserve the
11   evidence?
12 A.   Correct.
13 Q.   And so there was nothing -- no overt action
14   taken by your group between October the 30th,
15   2013 and August 5th, 2014 to preserve the
16   evidence?
17 A.   I'm not sure I know what you mean by overt
18   action.  I can say that we didn't inspect the
19   site until August of 2014.
20 Q.   Uh-huh.
21 A.   And I don't have a record of something else
22   being done between the time of original contact
23   and the survey of the site.
24 Q.   In order to reconstruct the -- the accident,
25   you had analyzed information related to the

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 18

1    vehicle involved, correct?
2  A. Yes.
3  Q. In order to reconstruct the accident, you had
4     to analyze the information related to the
5     trailer and its contents that were being pulled
6     by the subject vehicle, correct?
7  A. Yes.
8  Q. In order to analyze the -- Strike that.  In
9     order to reconstruct the accident, you had to
10    analyze the information related to the driver
11    of the vehicle, right?
12 A. Not so much the driver, no.  I was analyzing
13    what the vehicle did.
14 Q. Okay.  You didn't analyze what the driver
15    did?
16 A. Well, I certainly implied he was driving the
17    vehicle.  Of course.
18 Q. Sure.
19 A. And I understand he was in the vehicle and was
20    injured as a result of the accident.  But what
21    the driver was actually doing in the accident,
22    I haven't been asked to analyze that, if it can
23    be analyzed.
24 Q. Was part of your analysis in reconstructing the
25    accident to look at the environment or the

Page 19

1     roadway where the accident occurred?
2  A. Yes.
3  Q. Going back to Mr. Below, he was the driver,
4     correct?
5  A. Yes.
6  Q. And let me see if I understand this.  Have you
7     done anything to analyze Mr. Below's actions
8     from the points where you believe this accident
9     sequence began up to the point that the vehicle
10    rolled over?
11 A. No.  I've analyzed what the vehicle did, but
12    not what he was doing, if anything.
13 Q. Let's talk about some things you won't testify
14    about.  Narrow our field of vision here today.
15    Do you consider yourself an expert in the
16    design of steel-belted radial tires?
17 A. No.
18 Q. Do you consider yourself an expert in the
19    manufacturing of steel-belted radial tires?
20 A. No.
21 Q. Do you intend to offer any opinions with regard
22    to the manufacturing or design of the
23    steel-belted radial tire on the right rear of
24    the vehicle involved in this accident?
25 A. I do not.

Page 20

1  Q. How about any of the other tires that were on
2     the vehicle; do you have any -- are you going
3     to offer any opinions with regard to the design
4     or manufacture of those tires?
5  A. No.
6  Q. Do you intend to offer any opinions with regard
7     to the injury causation in this accident?
8  A. Well, if asked.  Mr. Below was injured in the
9     accident, but the mechanisms of it, the details
10    of it, I haven't been asked to analyze.
11 Q. Okay.
12 A. And don't anticipate giving an opinion
13    accordingly.
14 Q. Sometimes we call that the biomechanics of the
15    accident.  Have you been asked to analyze the
16    biomechanics of this accident?
17 A. I have not.
18 Q. Do you intend to offer any opinions with regard
19    to the biomechanics of this accident?
20 A. I had no intention, but it depends on questions
21    you might ask today.  But I had no intention of
22    doing so.
23 Q. And that's fair.  You understand we're in
24    federal court, you've been in federal court a
25    number of times, correct?

Page 21

1  A. I have.
2  Q. And you've issued a report in this case that
3     outlines your opinions and the basis of those
4     opinions, correct?
5  A. I did write a report, yes.
6  Q. And that was in compliance with the federal
7     rules, correct?
8  A. Yes, sir.
9  Q. So in that report, you don't talk about the
10    biomechanics of the accident, correct?
11 A. I did not.
12 Q. Okay.  Have you formed an opinion as to whether
13    or not Mr. Below was belted or unbelted in the
14    accident?
15 A. I have not.
16 Q. Do you intend to offer any opinions as to
17    warnings?
18 A. I don't anticipate offering opinions as to
19    warnings.
20       Again, there may be some question that
21    you may ask today, but that was not part of my
22    intended testimony or opinions given.
23 Q. Certainly.  And I didn't hire you, so I'm not
24    going to expand your scope of -- of what I'm
25    asking you to be an expert witness on.

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 22

1 Certainly there are no opinions in your report
2 related to warnings, are there, sir?
3 A.  You are correct.
4 Q.  Thank you.
5      Do you have any opinions with regard
6 to whether there was any sort of design defect
7 of the vehicle involved in this case?
8 A.  No.  I do not have such opinions.
9 Q.  Have you ever offered an opinion that a
10 passenger vehicle was defectively designed?
11 A.  Yes.
12 Q.  Which ones?
13 A.  Oh, my.  There have been a number over the
14 years.  There was some involving way back when,
15 armrests had the door release at the front of
16 the armrest, and in the accident people would
17 involuntarily lift their arms and open the door
18 and be ejected.
19      I go back to the Corvair days in my
20 analyses, although we were working for
21 General Motors, and I didn't consider it
22 defective at that time, but there were motor
23 mount cases where the motor mounts broke and
24 the engine shifted and caused the accelerator
25 to stick.

Page 23

1      I've had a number of cases over the
2 years where there have been stuck accelerators
3 in various types of vehicles.  There have
4 been questions -- And those were design
5 defects.
6      There was a defect in design of
7 placement of the seat belt such that it would
8 be cut when there was an accident.
9      I go back to the days of the Pinto
10 fire cases and the Ford products that had the
11 top of the fuel tank to be bottom of the
12 trunk.  I had those.
13      I'm sure there are a number of others
14 that I've had over the years.
15 Q.  Sure.
16 A.  But those are some examples that come to
17 mind.
18 Q.  Okay.  So you mentioned the Ford Pinto?
19 A.  Yes.
20 Q.  And was it the Chevrolet Corvair?
21 A.  Yes.
22 Q.  What vehicle contained the armrest where you
23 offered a defective --
24 A.  That was a common design.  It was GM and Ford.
25 It was in -- Those cars were in the '60s and

Page 24

1 '70s.
2      I had opinions about other types of
3 cases too, seat back failures.
4 Q.  Uh-huh.
5 A.  Volkswagen Beetles had a seat that would --
6 back that would fold rearward when the vehicle
7 was rear-ended, and people's heads would go out
8 the back window or their bodies would go out
9 the back window.
10      So I was involved in a number of those
11 cases analyzing the defects in design of the
12 seat backs.
13 Q.  What type of vehicles had the seat belt problem
14 where they would cut during an accident?
15 A.  It was a foreign vehicle.  I can't recall
16 whether it was a Fiat or something of that
17 nature.  I only recall one.  But that was a
18 defect in design in placement of a seat belt
19 next to a sharp edge of the seat back.
20 Q.  And what vehicle had the motor mount issue with
21 the -- Is that related to the stuck
22 accelerators, or are those two separate
23 items?
24 A.  Well, first of all, they were GM cases for the
25 most part, and then the accelerator would

Page 25

1 stick.
2      But I've had other cases where there
3 were stuck linkages.  I remember one in the
4 Upper Peninsula of Michigan, the vehicle had a
5 cable accelerator, because it was cold up
6 there, the cable was stiff, and when the driver
7 stepped on the accelerator it stuck in the full
8 acceleration position.  And I remember it
9 clearly because it went down and struck the
10 Bunny -- the Bunny -- Bugs Bunny Bread Company
11 or something of that nature.  That's why it
12 sticks in my hind.
13 Q.  I'm sure it wasn't funny for the person driving
14 the vehicle, but it is funny.  I can understand
15 why that would stick in your mind.
16      With regard to passenger vehicles,
17 have you ever offered opinion that a passenger
18 vehicle was defectively designed because of its
19 handling or stability?
20 A.  Not that I recall, no.
21 Q.  Have you ever defended an automobile
22 manufacturer against claims that its vehicle
23 was defective by design due to handling or
24 stability?
25 A.  No.

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 26

1  Q.  Have you ever offered an opinion that a piece
2      of farm machinery was defectively designed?
3  A.  Yes.
4  Q.  Have you ever offered an opinion that a piece
5      of farm machinery was defectively designed
6      because of its handling or stability
7      properties?
8  A.  No.
9  Q.  On the farm machinery, what types of defects
10     have you opined occurred in certain farm
11     machinery?
12 A.  You mean defects generally, or defects in
13     design?
14         Defects generally would include brakes
15     that failed, steering that failed.
16 Q.  Sure.
17 A.  Parts that broke, accelerator that stuck.  Some
18     cases of fires, although I try not to do many
19     of those, there were some fire causes.
20 Q.  Those would be more manufacturing type defects
21     you think, or --
22 A.  Or lack of maintenance.
23 Q.  Okay.
24 A.  And then design issues would be some other
25     kinds of defects, of course.

Page 27

1  Q.  Gotcha.
2          So let me see if I understand your
3      first answer.  With regard to farm machinery,
4      have you found in the past that there was a
5      defect in the product that was caused from a
6      lack of maintenance?
7  A.  That would be one way, yes.
8  Q.  And who was responsible for that lack of
9      maintenance in that particular situation?
10 A.  At times it was the farmer himself.  At times
11     it was the mechanic that did work for the
12     farmer.  At times it was the dealer who
13     repaired or made repairs or allegedly made
14     repairs.
15 Q.  And then you've also found design defects in
16     farm machinery?
17 A.  I have.
18 Q.  Don't have to go into great detail, but what
19     type of farm machinery have you found that had
20     design defects?
21 A.  Over the years, there were guarding issues on
22     manure spreaders, guarding of the drive shaft
23     on the side of a manure spreader.  There have
24     been issues of guardings of PTO.  There have
25     been issues of guarding of augers of various

Page 28

1      types, augers in silo unloading equipment.
2      There have been questions of guarding of return
3      corners and on barn cleaners.
4          And I know there have been numerous
5      others, but those would give you some flavor.
6          (Exhibit 25 marked for identification.)
7  Q.  I'm going to hand you what I've marked as
8      Exhibit 25 to your deposition, sir.  I
9      understand from counsel presently that we're
10     going sequentially, so we're starting with
11     Exhibit 25.  This is a notice to take your
12     deposition today with a subpoena duces tecum
13     attached?
14 A.  Yes.
15 Q.  Have you seen this document before?
16 A.  Yes.
17 Q.  Have you attempted to comply with the subpoena
18     duces tecum?
19 A.  Yes.
20 Q.  Have you brought with you each and every item
21     that was part of your file?
22 A.  Yes.
23 Q.  And one of the things I didn't see in your file
24     was any depositions.  Have you reviewed any
25     depositions in this case?

Page 29

1  A.  Yes.
2  Q.  How have you reviewed those?
3  A.  By reading them.  I have them in my file.  But
4      they came after my report was written.
5  Q.  Fair enough.
6          And you handed me your file before we
7      got on the record, and I was able to thumb
8      through it.  Would you mind going through and
9      pulling out the depositions that you reviewed
10     for me?
11 A.  Correct.  I shall do so.
12 Q.  Thank you, sir.
13 A.  I have the transcript of -- and exhibits of the
14     deposition of Trooper Chad Thompson, which was
15     taken on September 8th, 2016.  I have the
16     transcript of the deposition of Scott Stoffel.
17     That was -- S-t-o-f-f-e-l.  That was taken on
18     May 25th.
19 Q.  Who's Mr. Stoffel?
20 A.  Mr. Stoffel was a passenger in Mr. Below's
21     vehicle at the time of the accident.
22 Q.  Okay.
23 A.  And those would be the depositions I have.  But
24     I also have received a statement, this is by a
25     witness, his name was Chris Jensen -- or

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 30

1    Jessen, J-e-s-s-e-n, and that was taken on
2    February 22nd, 2016.
3              Now, I know that's not a transcript,
4    but it's a document that I had.
5  Q.  May I see that?  Sure.
6              Any other depositions or transcripts
7    that you reviewed?
8  A.  No.
9  Q.  You have not reviewed Mr. Below's deposition
10   transcript?
11 A.  I have not.
12 Q.  Do you know why not?
13 A.  It was never sent to me.  I understand
14   Mr. Below doesn't have any recollection of the
15   accident.  I did ask one time about how
16   Mr. Below was doing and if he remembered
17   anything about the accident.  It's my
18   understanding, I could be incorrect, it was my
19   understanding Mr. Below was injured to the
20   degree he didn't remember anything about the
21   accident.
22 Q.  That's what you've been told by counsel?
23 A.  Yes.
24 Q.  Are you aware of whether Mr. Below had any
25   recollection of the care and maintenance of the

Page 31

1    vehicle involved in the accident?
2  A.  No.
3  Q.  Are you aware of whether or not Mr. Below had
4    any information in the deposition with regard
5    to the loading on the vehicle --
6  A.  No.
7  Q.  -- on the day of the accident?
8  A.  I'm sorry.  No.
9  Q.  Did your review of the trooper's deposition,
10   the passenger's deposition, and the statement
11   by an eye witness in any way change or alter
12   your opinions that you intend to offer in this
13   case?
14 A.  No.
15 Q.  May I see your file for just a second?
16 A.  Of course.  Which part, the part with all the
17   numbers?
18 Q.  Yeah.
19 A.  Or the part that --
20 Q.  Give me the part with the numbers, please.
21 A.  Yes, sir.
22 Q.  We'll just do some marking here and get some
23   house cleaning out of the way.  How about
24   that?
25 A.  That's fine.  I don't know if all the numbers

Page 32

1    are in the same order they were originally.
2  Q.  Fair enough.
3  A.  So good luck with that.
4  Q.  You've brought a copy of your report in this
5    case?
6  A.  Yes.
7  Q.  And attached to your report is also a
8    curriculum vitae and what was a current Rule 26
9    list at the time you issued your report?
10 A.  Yes.
11 Q.  I'll mark that as Exhibit 26 to your
12   deposition.
13           (Exhibit 26 marked for
14   identification.)
15 Q.  And for ease sake, it's Bates numbered SKO66
16   through 77.  All right?
17 A.  Yes, sir.
18 Q.  There's a number of documents clipped together
19   here that are Bates labeled SKO003 through
20   SKO00 -- or excuse me, 010.  Would you take a
21   look at those?
22 A.  Yes.
23 Q.  What are those?
24 A.  Those are our invoices to Mr. Rottier
25   concerning our work done on this file.

Page 33

1  Q.  Is that the entirety of your invoices that have
2    been issued to Mr. Rottier related to this case
3    thus far?
4  A.  Yes.
5  Q.  Has additional work been done since then?
6  A.  Yes.
7  Q.  What has that work included since then?
8  A.  I've read the transcripts of the deposition and
9    the statement, and I reviewed the file
10   yesterday in anticipation of this deposition.
11 Q.  What's the date of the last invoice in that
12   stack?
13 A.  February 29th, 2016.
14 Q.  You don't have March 1st, 2016, Bates SKO010,
15   the last one in the stack?
16 A.  I do.  Oh.  The -- You asked me the date of the
17   last activity, and that was February 29th,
18   2016.
19 Q.  Sure.
20 A.  There's another page to it?  I only have one
21   page with my No. 10.
22 Q.  That's what I have also.  That's the date of
23   the invoice is March the 1st, right?
24 A.  Yes.
25 Q.  Okay.  Have you totaled the amount of those

DENNIS D.   SKOGEN, MSME – 10/13/2016

| | Page 34 |
|---|---|

1     invoices?

2  A.  No.

3  Q.  **Okay.  Would it surprise you if it totaled**

4     **$22,333.40 between the invoice dated 9/24/15**

5     **and 3/1 of '16?**

6  A.  Not much surprises me, but I don't know if

7     that's correct addition.  Or sometimes we have

8     an amount due that sometimes gets added back

9     in.

10  Q.  **Sure.**

11  A.  But I haven't added up the numbers to tell you

12     if that's a correct statement or not.

13  Q.  **Let's mark those as Exhibit 27.**

14     (Exhibit 27 marked for

15     identification.)

16  Q.  **How much do you charge per hour for your time,**

17     **sir?**

18  A.  Skogen Engineering Group would charge $375 per

19     hour for my time.

20  Q.  **Okay.**

21  A.  It was not that when we started on the file,

22     however.

23  Q.  **What was it when you started on the file?**

24  A.  I would look at the invoice again, please, and

25     I could tell you.

| | Page 35 |
|---|---|

1  Q.  **Absolutely.**

2  A.  Because I don't specifically recall what it was

3     in 2013.  Oh, it was 375 in 2013.  So I haven't

4     raised the rates since then.

5  Q.  **Since 2013 when you received this file up to**

6     **today, you still charge $375 an hour for your**

7     **services?**

8  A.  The company does, yes.

9  Q.  **I understand.  Is it $375 an hour for anything**

10     **that you do on the file?**

11  A.  Yes.

12  Q.  **Including deposition time?**

13  A.  Yes.

14  Q.  **Trial time?**

15  A.  Yes.

16  Q.  **Travel time?**

17  A.  Yes.

18  Q.  **Any form of investigation is $375 an hour?**

19  A.  Yes.  If I again remember to fill out paperwork

20     to get that accomplished, of course.

21  Q.  **Were there any other engineers working on the**

22     **file with you?**

23  A.  Yes.

24  Q.  **Who else worked on the file with you?**

25  A.  Jeff Peterson.

| | Page 36 |
|---|---|

1  Q.  **Uh-huh.**

2  A.  Zack Bingen.  Zack is Z-a-c-k, Bingen,

3     B-i-n-g-e-n.

4  Q.  **Anybody else?**

5  A.  Dave Zuelhke.  Dave Zuelhke, Z-u-e-l-h-k-e.

6  Q.  **Sure.**

7  A.  Those would be the engineers.

8  Q.  **What form of engineering degree does David**

9     **Zuelhke have?**

10  A.  He has a mechanical engineering degree and a

11     master's degree in engineering.

12  Q.  **What are David's rates?**

13  A.  I don't remember what they were in 2013.

14  Q.  **What are they today?**

15  A.  Mr. Zuelhke is no longer with our firm.  He's

16     now a fireman in the city of Fitchburg.

17  Q.  **Zackary Bingen?**

18  A.  Bingen, yes.

19  Q.  **What were his rates?**

20  A.  Again, I don't know.  They certainly didn't

21     approach 375.  Perhaps a hundred dollars an

22     hour or something in that area, I would say.

23  Q.  **And how about Jeffrey Koch; what were his**

24     **rates?**

25  A.  Jeffrey Peterson.

| | Page 37 |
|---|---|

1  Q.  **I'm sorry.  I underlined the wrong Jeffrey on**

2     **your masthead here.**

3     **Jeffrey Peterson, what were his rates?**

4  A.  Jeff Peterson was probably about 250, I would

5     say.

6  Q.  **And I'm looking at your billing there that**

7     **we've marked as Exhibit 27, and there's a**

8     **number of different individuals listed on what**

9     **I call the masthead.**

10  A.  Yes.

11  Q.  **And you're first on that list, and the**

12     **engineering group is called Skogen Engineering**

13     **Group?**

14  A.  It is.

15  Q.  **Are you the sole owner of Skogen Engineering**

16     **Group?**

17  A.  No, sir.

18  Q.  **What percentage do you own, sir?**

19  A.  22 percent.

20  Q.  **Who owns the other 78 percent?**

21  A.  Jeffrey Peterson, Robert Wozniak,

22     W-o-z-n-i-a-k.

23  Q.  **Anybody else?**

24  A.  Excuse me.  Mary Stoflet, S-t-o-f-l-e-t, James

25     Torpy, T-o-r-p-y, Paul Erdtmann,

DENNIS D.   SKOGEN, MSME - 10/13/2016

1    E-r-d-t-m-a-n-n.  That's the extent.
2  Q.  Do you share equal -- Strike that.  Do you
3      share by percentage ownership in the profits of
4      Skogen Engineering Group?
5  A.  Yes and no.
6  Q.  Okay.  Do you receive a salary?
7  A.  Yes.  And when I say the profits, we have a
8      401(k) plan, so it depends upon, as I
9      understand it, what the -- what salaries were
10     received by people.
11 Q.  Okay.
12 A.  Rather than what the percentage of stock
13     ownership is.
14 Q.  Fair enough.
15         In the last three years, have you
16     owned any greater percentage other than 22
17     percent?
18 A.  Three years ago, it was probably closer to 25
19     percent.
20 Q.  Okay.  Who makes the decision as to whether or
21     not a new partner comes on and takes a
22     percentage of ownership?
23 A.  Myself, Mr. Peterson, Mr. Wozniak,
24     Mr. Erdtmann, Mr. Torpy and Ms. Stoflet.
25 Q.  Does it have to be a hundred percent agreement

1      to bring on a new partner?
2  A.  We never thought of that.  That's our group of
3      stockholders.  It's also our board of
4      directors.
5          But we are usually unanimous if we
6      decide that there's going to be another
7      stockholder.
8  Q.  So you have -- You get paid a salary, is that
9      correct?
10 A.  Yes.
11 Q.  And then profits are divided by -- in terms of
12     401(k) distribution; is that what I
13     understand?
14 A.  Yes.  Yes.
15 Q.  Is there any other means by which profits are
16     distributed?
17 A.  If we have leftover from 401(k) and from the
18     donations we make, and it happens upon
19     occasions, we then distribute some leftover
20     money to the stockholders based upon their
21     percentage of ownership.
22 Q.  Has there ever been a year in the last four
23     years where you have not received some leftover
24     money that was distributed by percentage of
25     ownership to the stockholders?

1          MR. ROGERS:  Object to the form.  Go
2      ahead.
3  A.  Perhaps three years ago.  We had some leftover
4      money last year, I know that.  Not a lot, but
5      we had some leftover.
6          MR. TAYLOR:
7  Q.  You've also brought with you --
8          (Exhibit 28 marked for
9      identification.)
10 Q.  -- marking your file copy, a copy of your
11     curriculum vitae, which I'm marking as
12     Exhibit 28 to your deposition.
13 A.  Yes.
14 Q.  Is that a current copy?
15 A.  Yes.
16 Q.  Anything you need to add or delete from that
17     curriculum vitae?
18 A.  No.
19 Q.  I noticed in your file that there are not
20     copies of the reports from Gray Beauchamp and
21     Steve Fenton regarding their accident
22     reconstruction.  Did I just miss them?
23 A.  Those were attached to answers to
24     interrogatories, which I received after the
25     report was written.

1  Q.  Was there anything about Mr. Fenton or
2      Mr. Beauchamp's report that changed or altered
3      your opinions in this case?
4  A.  No.
5  Q.  May I see that other stack of materials?
6  A.  Yes.
7  Q.  I must have been asleep at the wheel when I
8      looked at them and didn't have my coffee yet.
9  A.  I know I had them, and if they're not there I
10     wouldn't know why.  The one I received was
11     Mr. Beauchamp.  I recall reading it.
12 Q.  Sure.  Who prepared the indexed deposition of
13     Scott Stoffel?
14 A.  I did, and Mary Stoflet typed it.
15 Q.  Okay.  We'll mark that as Exhibit 29 to your
16     deposition.
17         (Exhibit 29 marked for
18     identification.)
19 Q.  What's in -- Do you know what's in this
20     envelope here?  It has a No. 26075 on it.  Oh.
21     Scott Stoffel deposition exhibits.  How about
22     that?
23 A.  Yes.  It's the transcript and the exhibits.  I
24     printed out the transcript.
25 Q.  Did you make any summary of the trooper's

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 42

1    deposition?
2    A.   Not a summary, but an index, which is in the
3         front of the folder you're holding.
4    Q.   I'm going to mark that index as Exhibit 30 to
5         your deposition.
6              (Exhibit 30 marked for
7         identification.)
8    Q.   Did you review the deposition -- Strike that.
9         Did you review the report of Gray Beauchamp?
10   A.   Yes.
11   Q.   Did you make any notes about it?
12   A.   No.
13   Q.   Here it is.  Is this your revised Rule 26 list?
14   A.   Yes.
15   Q.   Let me mark as Exhibit 31 a revised Rule 26
16        list that you have brought with you this
17        morning.
18             (Exhibit 31 marked for
19        identification.)
20   Q.   Is it up-to-date as to the last time you made a
21        trial appearance on October the 10th, 2016?
22   A.   Yes.  But it's not a revision.  It's an
23        addition, an up-to-date.  It's not revised
24        in terms of the headings that would have been
25        in the other previously provided Rule 26

Page 43

1         list.
2    Q.   Sure.  Did you drop some off the top since
3         those dates had expired?
4    A.   I probably did, yes, because it's a four-year
5         list.
6    Q.   Sure.  Do you keep anywhere a list -- That's
7         Exhibit 31, correct?
8    A.   Yes.
9    Q.   Do you keep anywhere a list of depositions or
10        trial testimony that goes further back than
11        four years?
12   A.   No.
13   Q.   Let me hand you this back, sir.
14   A.   Yes.
15   Q.   Also in your file is a CD that says "Inspection
16        photographs 1 through 336" taken November the
17        4th, 2013, August the 11th, 2014, and 9/22/15?
18   A.   Is it the 4th or the 14th?  But yes, those are
19        our pictures.
20   Q.   It's hard to read from there.  I apologize.  I
21        hand it to you?
22   A.   Yes.  Those are our photographs taken by
23        Mr. Peterson and myself.
24   Q.   Okay.  I believe I've been given a copy of all
25        of those, but just in case, I'm going to go

Page 44

1         ahead and mark this Exhibit 32 and she can
2         duplicate it for us.  Okay?
3    A.   Yes, sir.
4              (Exhibit 32 marked for
5         identification.)
6    Q.   Thank you.
7              There's another folder here, it looks
8         like with your case number on it, 26705, it has
9         a CD that says "Below, Joshua photographs"?
10   A.   Yes.
11   Q.   And then that was attached to some printouts of
12        some photographs of the accident scene, is that
13        correct?
14   A.   Yes.
15   Q.   And those have been Bates labeled and produced
16        to me already.  We don't need to mark them
17        again.
18             There's some additional photographs
19        Bates labeled SKO42 through 64.  Whose
20        photographs are those?  If you know.
21   A.   Offhand I don't recall.  It may be
22        Mr. Peterson's, but they may have been provided
23        to us also.
24   Q.   Okay.  Some additional accident scene
25        photographs Bates labeled BEL050004 through

Page 45

1         BEL050019.  Do you know where those came
2         from?
3    A.   They were sent to us from Mr. Rottier's office,
4         but they appear to be police-taken
5         photographs.
6    Q.   There's some manila folders in here.  The first
7         one is "Vehicle Specifications."  Is that your
8         handwriting on the first page of that document?
9    A.   Some is, but most is not.  It's Mr. Zuelhke.
10   Q.   Next manila folder is the correspondence
11        between you and Mr. Rottier's firm, is that
12        correct?
13   A.   Or between my office and Mr. Rottier's firm,
14        yes.
15   Q.   Fair enough.  Fair enough.
16             The next manila folder is the police
17        materials that also contain the police report
18        and the policeman's photographs, is that
19        correct?
20   A.   Yes.
21   Q.   Okay.  I'm going to mark the next manila folder
22        as Exhibit 33.
23             (Exhibit 33 marked for
24        identification.)
25   Q.   Can you tell us what that is, sir?

DENNIS D.   SKOGEN, MSME - 10/13/2016

1   A.   Yes.  Exhibit 33 contains SKO129 through
2        SKO135, and they are eight-by-ten color photos
3        of the area where the accident occurred.  It's
4        from the Google Earth Street View.
5   Q.   Whose handwriting is on those photographs?
6   A.   Mr. Peterson.
7                 (Exhibit 34 marked for
8        identification.)
9   Q.   Let me hand you what I've marked as Exhibit 34.
10       This is a manila folder marked "Calculations,"
11       is that correct?
12  A.   Yes, it is.
13  Q.   Is that the entirety of the calculations that
14       you've performed in this matter in order to
15       render your opinions in this case?
16  A.   Yes.
17                (Exhibit 35 marked for
18       identification.)
19  Q.   I hand you what's been marked as Exhibit 35 to
20       your deposition.  It's a manila folder marked
21       "Inspection Notes."  What's that?
22  A.   These are the notes generated at the time of --
23       times actually of the inspections of the
24       accident site, and also notes containing such
25       as the September 22nd, 2015 inspection by

1        myself of the Yokohama tire, and it's SKO143.
2                 Exhibit 25 contains SKO138 through,
3        and provided they're still in numerical order,
4        SKO149.
5   Q.   Is Exhibit 35 the entirety of the handwritten
6        inspection notes that exist related to this
7        file?
8   A.   Yes.
9   Q.   Are there any other electronic notes that exist
10       related to this file that you have not brought
11       with you?
12  A.   No.
13  Q.   Somehow this piece of correspondence got
14       separated from the stack.  Sorry about that.
15  A.   Yes.  SKO65 is the cover letter from my report
16       that was sent to Mr. Rottier, and we marked --
17       I thought we marked the report.  Maybe we did
18       not.
19  Q.   Exhibit 26, yes, sir, we did.
20  A.   Yes.  So this be would the cover letter for
21       Exhibit 26.
22  Q.   Fair enough.  Do you mind if we not make that
23       part of Exhibit 26?
24  A.   No.
25  Q.   Okay.

1   A.   I don't mind at all.
2   Q.   Fantastic.
3                 (Exhibit 36 marked for
4        identification.)
5   Q.   Last thing for now that I'd like to mark as
6        Exhibit 36 is SKO078, and it's a full diagram
7        of the accident scene, is that  correct?
8   A.   Yes, it is.
9   Q.   Excuse me.  Is this something your office put
10       together?
11  A.   It is.
12  Q.   And does it depict the accident scene and what
13       you believe to be the movement of the vehicle
14       during the accident sequence?
15  A.   Yes.
16  Q.   Have you noted on there indications where
17       certain items were found?
18  A.   Yes.
19  Q.   Debris?
20  A.   Yes.
21  Q.   All right.  We're going to come back to this.
22                Did you request anything else to
23       review that you have not received?
24  A.   No.
25  Q.   Does your opinion that we've marked as Exhibit

1        -- Strike that.  Does your report that we've
2        marked as Exhibit 26 reflect your current
3        opinions that you intend to offer in this
4        case?
5   A.   Yes.  Not all of them, but some of them
6        certainly.
7   Q.   Sure.  Well, with regard to the accident
8        reconstruction it does, right?
9   A.   It doesn't have the speed on the drawing.  But
10       the drawing does show the accident sequence,
11       yes.
12  Q.   I apologize.  And I had switched gears on you.
13       I'm not trying to be tricky.  I was talking
14       about your report marked as Exhibit 26.
15  A.   Oh, I'm sorry.
16  Q.   Yes, sir.
17  A.   I thought you were talking about the drawing.
18  Q.   Well, I was talking that way and you're sitting
19       this way, so it's my fault.
20  A.   That's right.  It's -- The report does contain
21       my opinions, yes.
22  Q.   Thank you, sir.
23  A.   And let me get that in front of me so we can
24       talk about it.
25  Q.   Sure.  Well, we're going to skip around just a

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 50

1       little bit.
2               Did you ever meet with anybody about
3       this accident?
4    A. No.  Well, I certainly met with Mr. Rottier and
5       talked to him about the accident.
6    Q. Sure.  Anybody else?
7    A. No.  Not outside of our office, no, no one
8       else.
9    Q. Didn't meet with the eyewitness?
10   A. I did not.
11   Q. You have not met Mr. Below?
12   A. I have not.
13   Q. You didn't meet with the police officer?
14   A. I did not.
15   Q. The notes indicate that you first inspected the
16      scene on August the 11th, 2014?
17   A. I did not.  Mr. Peterson did.
18   Q. Okay.  Have you ever been to the scene?
19   A. I have, but not for purposes of this accident.
20      I've been through there many times.
21   Q. Driven through there?
22   A. Correct.
23   Q. All right.  Have you ever stopped at this
24      accident scene to perform any type of
25      investigation related to this accident?

Page 51

1    A. I did not stop, you're correct.
2    Q. All right.  So Mr. Peterson went to the scene
3       on August the 11th, 2014, is that right?
4    A. That's correct.
5    Q. Do you know why there was almost a year between
6       the accident and when Mr. Peterson first went
7       to the scene?
8    A. No.
9    Q. Are you aware of the fact that the accident
10      scene is right around a hundred miles from your
11      office?
12   A. I wouldn't doubt it.  I don't know that to be a
13      fact.
14   Q. It's not -- It's pretty close by?
15   A. It's not a long ways away.
16   Q. That's my point.
17              Do you know why there was that gap in
18      time?
19   A. No, I don't, but it's not unusual for a client
20      to have us open a file and then gather
21      information, and particularly in Wisconsin over
22      the last several years, the officers have been,
23      I hate to use the word slow to release the
24      police reports and photographs.
25              But I don't know the exact reason why

Page 52

1       the inspection was made August 11th, 2014.
2    Q. Uh-huh.  What did Mr. -- Well, strike that.
3       Was anyone else beside Mr. Peterson at the
4       scene of the accident on August the 11th,
5       2014?
6    A. Yes.
7    Q. Who else?
8    A. Investigator Tom Malone of Mr. Rottier's
9       office.
10   Q. Anybody else?
11   A. No.
12   Q. Did Mr. Malone assist in the investigation of
13      the accident scene?
14   A. Yes.
15   Q. In what means?
16   A. In holding the survey stick so the survey could
17      be generated, and the points generated shown on
18      SKOGEN139 through 142 contained in
19      Exhibit 20 -- 35.
20   Q. What was Mr. Peterson's purpose for going to
21      the scene on August the 11th, 2014?
22   A. To survey the accident site and to preserve any
23      evidence that may still have been present.
24   Q. Did he survey the accident scene?
25   A. Yes, he did.

Page 53

1    Q. Is that part of the exhibit that you just
2       referenced?
3    A. Yes.  The downloaded survey points.  He used a
4       total station, and so the downloaded survey
5       points are contained on SKO139 through SKO142
6       in Exhibit 25 -- or 35.
7               May I write the 3 better so it doesn't
8       look like a 2?
9    Q. Are you saying my handwriting is messy?
10   A. No.  Every time I look at it, it looks like a 2
11      instead of a 3.
12   Q. Fair enough.  Here's a pen.
13   A. Thank you.  Thank you.
14   Q. Thank you.  Appreciate that.
15              Do you know how long Mr. Peterson
16      spent at the scene during that first
17      inspection?
18   A. I wasn't there, so I don't know how long.
19      Typically it would be three, four hours.  But I
20      don't know how long he was there.
21   Q. And he did it by total station?
22   A. Yes.
23   Q. Do you know what his reference point was?
24   A. I don't know if he tied it into some other
25      reference point, but usually it doesn't matter

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 54

1    because you set up the total station and you
2    survey the points.
3  Q.  Uh-huh.
4  A.  And then the points are related to each other,
5    and they don't need to be related to the
6    total station location or a reference point per
7    se.
8  Q.  Are you aware of whether Mr. Peterson was able
9    to retrieve any evidence from the scene that
10   day?
11 A.  I do understand that there were some pieces of
12   evidence still present, some pieces of tire and
13   broken glass and scallop marks and that sort of
14   thing in the shoulder -- or in the median.
15 Q.  Sure.  What -- Which -- Let me start over.
16   Which pieces of evidence did Mr. Peterson
17   actually retrieve from the scene, if any?  Did
18   he pick up anything and bring it back to the
19   office with him?
20 A.  I don't see that he did.  SKO147 indicates the
21   survey points of the biggest tire piece and
22   photographs were taken.  Then there were some
23   other tire fragments.  But photos were taken.
24   I don't recall those being picked up, however,
25   the smaller pieces, and there were flags

Page 55

1    marked, and you may see those in Mr. Peterson's
2    photographs, the survey evidence.
3       I don't -- I'm not aware that
4    Mr. Peterson picked up any of the evidence at
5    the time of the April -- or pardon me,
6    August 11th, 2014 survey.
7  Q.  By what means did Mr. Peterson verify that the
8    tire fragments that he found on the scene
9    almost a year after the accident were related
10   to this particular accident?
11 A.  A subsequent study revealed that the tread
12   pattern was the same for the tire and the other
13   tires.
14 Q.  Was that on the big piece of tire that he
15   found?
16 A.  Yes.
17 Q.  What about the fragments that he found?
18 A.  I don't know if he correlated those to where
19   they came from, from this tire or from
20   something else.  I don't know that to be a
21   fact.
22 Q.  Has anybody since then made any effort to
23   correlate the tire fragments that were found
24   at the scene in August of 2014 to the actual
25   tire that failed on Mr. Below's pickup

Page 56

1    truck?
2  A.  Not of which I'm aware.
3  Q.  You've been to enough accident scenes to
4    know that there's a lot of tire fragments
5    on the roadways of United States, aren't
6    there?
7       MR. ROGERS:  Object to form.  Go
8    ahead.
9  A.  Well, if you take the whole United States, I
10   suppose there are a lot of tire fragments.  But
11   it's not something you just find on all roads
12   in all places at all times.
13      MR. TAYLOR:
14 Q.  Really?
15 A.  Of course not.
16 Q.  Really?
17 A.  That's right.
18 Q.  In Wisconsin you don't find tire fragments,
19   like you couldn't walk out on the interstate
20   right now and find tire fragments almost --
21   along the way?
22 A.  If you go out on the interstate right now, you
23   probably could find some semi separated tires.
24   But my experience having surveyed the
25   interstate many, many times, you don't find

Page 57

1    that many.
2  Q.  Okay.  Y'all do a better job of cleaning your
3    roadways than we do in Texas.  Congratulations.
4  A.  Thank you.
5  Q.  There was a subsequent inspection of the
6    accident scene in November of 2014, is that
7    right?
8  A.  Yes.
9  Q.  Okay.  Who did the subsequent inspection of the
10   accident scene?
11 A.  Mr. Peterson.
12 Q.  Do you know why he did a second or subsequent
13   inspection?
14 A.  Yes, I do.
15 Q.  Why?
16 A.  Because he wanted to measure the -- I'll call
17   them rumble strips.  Some people call them
18   wake-me-up strips along the side of the road,
19   and he wanted to use those and measure those
20   for use in analyzing the photographs taken by
21   the officers.
22      And that's shown in SKO144 in
23   Exhibit 35.
24 Q.  Did Mr. Peterson do anything else on that
25   second survey -- strike that, on that second

DENNIS  D.   SKOGEN, MSME – 10/13/2016

Page 58

1    inspection on November 17th, 2014?
2         MR. ROGERS:  I'm sorry.
3         MR. TAYLOR:  Yeah.  It was a horrible
4    question. Let me start all over. Yeah.  No.
5    It was me.  Let me start all over.
6  Q.  Other than measuring the rumble strips during
7    that inspection in November of 2014, are you
8    aware of Mr. Peterson doing anything else?
9  A.  No.
10 Q.  That was his sole purpose in going out there?
11 A.  Yes.
12 Q.  Did anyone else attend the November 17th, 2014
13   inspection?
14 A.  No.
15 Q.  Do you know how long he spent during that
16   inspection looking at the rumble strips?
17 A.  If you're asking me do I know having been there
18   to watch him do it and time him, the answer
19   would be no.  But I would say probably less
20   than an hour.
21 Q.  Are his notes reflected in Exhibit 35?
22 A.  Yes.
23 Q.  Other than correlating the size of the rumble
24   strips with the photographs taken by the
25   police, was there any other purpose that you're

Page 59

1    aware of of measuring the rumble strips at the
2    accident scene?
3  A.  No.
4  Q.  Has anyone else from your office been to the
5    scene of the accident to investigate it?
6  A.  Not of which I'm aware, no.
7  Q.  During -- I'm going to go ahead and roll both
8    inspections into one, if that's all right, with
9    the next set of questions.
10 A.  That's fine.
11 Q.  During either inspection, did Mr. Peterson find
12   any tire marks on the roadway?
13 A.  Not of which I'm aware, no.
14 Q.  Had the roadway been resurfaced between the
15   time of the accident and when Mr. Peterson
16   first went to the scene?
17 A.  Not of which I am aware, no.
18 Q.  During that first inspection, did Mr. Peterson
19   mark the scene, with tape or spray paint?
20 A.  Not of which I'm aware, no.
21 Q.  You're just not aware?
22 A.  Well, I knew they used flags.  But as far as
23   spray paint, I would say no, they did not.
24 Q.  Did Mr. Peterson find any gouge marks on the
25   actual roadway?

Page 60

1  A.  On the pavement surface?  No.  Not of which I'm
2    aware, he did not.
3  Q.  So no tire marks, no gouge marks on the roadway
4    that he found?
5  A.  That's correct, at the time of his
6    inspection.
7  Q.  Sure.  And you already mentioned in answer to
8    one of the questions, that he did find some
9    markings from the subject vehicle in the
10   median?
11 A.  Yes.
12 Q.  Did he find any on the other side of the
13   roadway where the vehicle ended up?
14 A.  Not of which I'm aware.
15 Q.  Okay.  I understand from your report that you
16   guys measured the width of the roadway, is that
17   right?
18 A.  Yes.
19 Q.  Did you make an assessment of the dropoff
20   between the edge of the roadway and the center
21   of the median where the vehicle traveled?
22 A.  I'm sure it was surveyed, but I don't have a
23   number particularly in mind for that without
24   studying the survey further.
25 Q.  It would be in the survey documents?

Page 61

1  A.  Yes.
2  Q.  Okay.  The photographs that we've marked that
3    are from the scene, Mr. Peterson would have
4    taken all of those?
5  A.  Yes.  The photograph taken at the site at the
6    time of his inspection?  Yes.
7  Q.  Fair enough.  He wasn't at the actual scene of
8    the accident?
9  A.  Correct.  I call that when the accident
10   occurred, and those photographs were taken by
11   the officers.
12 Q.  That's a much more precise way of referring to
13   it.
14 A.  Thank you.
15 Q.  Scene versus the site.
16 A.  Thank you.
17 Q.  Gotcha.  I'm going to adopt that from here on
18   out.
19 A.  You go right ahead.
20 Q.  Learn something new every day.
21       Let's go back to the subpoena duces
22   tecum for just a second, which I believe is
23   Exhibit 25.
24 A.  It is.
25 Q.  Did you perform -- Strike that.  Did you offer

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 62

1    any videotaped or recorded interviews related
2    to this accident?
3  A.  Did I offer?  I not only didn't offer any, I
4    haven't seen any.
5  Q.  Did you participate in any?
6  A.  No.  There is that recorded statement that I
7    told you about before from a witness.  But no.
8    I have not participated in any videotaped or
9    recorded interview, nor has my office.
10 Q.  You brought with you all the correspondence
11   between your company and Mr. Rottier's law
12   firm, correct?
13 A.  Yes.
14 Q.  You brought with you all records of payment in
15   connection with this particular file, correct?
16 A.  I brought with the invoices which were sent
17   out.  I expect they were paid, so it would be
18   the same.
19 Q.  If not, you should get a check before you
20   leave.
21 A.  Okay.  Thank you.
22 Q.  Do you have any articles or publications that
23   you've written or contributed to that you
24   brought with you?
25 A.  No.

Page 63

1  Q.  Do you have a publications list?
2  A.  No.  I haven't written anything except my
3    master's thesis.
4  Q.  Okay.  You haven't been published in any sort
5    of trade journal or otherwise?
6  A.  I have not.
7  Q.  Okay.  Has anyone from Skogen Engineering been
8    published on any type of issue related to
9    accident reconstruction or vehicle dynamics?
10 A.  Not of which I'm aware.
11 Q.  Did you bring with you any articles or learned
12   treatises or textbooks that you intend to rely
13   upon for the opinions that you're going to
14   offer in this case?
15 A.  No.
16 Q.  Did you provide Mr. Rottier or anyone in his
17   office a list of learned treatises and articles
18   that you intend to rely upon for your opinions
19   in this case?
20 A.  No.
21 Q.  Do you have a list of learned treatises or
22   publications that you intend to rely upon for
23   your opinions in this case?
24 A.  No.
25 Q.  Does your company do any advertising, sir?

Page 64

1  A.  Yes.
2  Q.  And by what means?
3  A.  If I recall properly, we're on the Internet.
4    There's a website, skogenengineering.com.  I
5    haven't looked at it for a number of years, so
6    I'm not sure what it says.
7  Q.  Anything else?
8  A.  There may be a brochure that's handed out at
9    presentations by Mary Stoflet, to the best of
10   my recollection.  I haven't seen that for a
11   long time either.
12 Q.  Advertising is not your -- not your area of
13   concern?
14 A.  No.  And we don't -- I wouldn't call it
15   advertising, but it's information, because
16   we're asked questions.  And my CV is on the
17   website, as an example.  But I personally don't
18   advertise.
19 Q.  Your CV is pretty good advertising, isn't it?
20   You don't have to answer that.  I'm just --
21 A.  I don't consider it an ad.  I just consider
22   people want to know who I am and my
23   experience.
24 Q.  Sure.  Sure.
25      Did you review any documents produced

Page 65

1    by Yokohama in this case?
2  A.  No.
3  Q.  Do you intend to?
4  A.  Not unless somebody sends me something and asks
5    me to.  I have no intention of doing so.
6      MR. KRIVA:  Off the record.  How about
7    a bathroom break?
8      MR. TAYLOR:  Sure.  Absolutely.
9      MR. KRIVA:  For my
10   younger-than-Dennis's kidneys.
11     MR. TAYLOR:  How about we go off the
12   record completely with that note?
13     THE VIDEOGRAPHER:  Going off the
14   record at 10:12.
15     (A break was taken from 10:12 to
16   10:26.)
17     (Exhibit 37 marked for
18   identification.)
19     THE VIDEOGRAPHER:  We are back on the
20   record at 10:26 a.m.
21     MR. TAYLOR:
22 Q.  Mr. Skogen, are you ready to proceed?
23 A.  Yes, sir.
24 Q.  All right.  I have marked the statement of
25   Chris Jessen as Exhibit 37 to your deposition,

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 66

1    okay?
2  A.  Yes, sir.
3  Q.  And that's the exhibit that you received
4      apparently on September 19th, 2016?
5  A.  Yes.
6  Q.  And if you look at the beginning here, it looks
7      like the statement was actually taken on
8      February 22nd, 2016, is that right?
9  A.  Yes.
10 Q.  Did you or anyone else from Skogen Engineering
11     have an opportunity to inspect the vehicle
12     being driven by Mr. Below on the date of the
13     accident?
14 A.  We did not inspect the vehicle, nor the
15     trailer, nor any of the contents.
16 Q.  You already answered my next question.  You did
17     not get an opportunity to inspect the trailer
18     either, is that right?
19 A.  We did not do so, you are correct.
20 Q.  Did you have an opportunity to inspect either
21     of the all-terrain vehicles or ATVs that were
22     being pulled on the trailer on the date of the
23     accident?
24 A.  We did not inspect them.
25 Q.  Would you agree with me that it's possible that

Page 67

1      if you had had an opportunity to inspect the
2      vehicle, you might have additional opinions
3      that you could offer in this case?
4  A.  That's possible.
5          MR. ROGERS:  Object to form.  Go
6      ahead.
7  A.  Yes.
8          MR. TAYLOR:
9  Q.  If you had been able to inspect the subject
10     vehicle -- Strike that.  What was the vehicle
11     that Mr. Below was driving that day?
12 A.  It was -- I can tell you exactly here.  I'll
13     reference my report that we marked as
14     Exhibit --
15 Q.  Exhibit 26?
16 A.  26.  And I have my model vehicle data sheet
17     also.  It was a 2005 GMC K2500 extended-cab
18     pickup.
19 Q.  If I refer to that vehicle as the subject
20     vehicle, is that okay with you?
21 A.  That's fine with me.
22 Q.  Do you understand what I mean when I say
23     subject vehicle?
24 A.  Yes.  I understand that's the only vehicle
25     involved.  Yes, I do.

Page 68

1  Q.  Okay.  If you had had an opportunity to inspect
2      the subject vehicle, one of the things that you
3      could have inspected would have been the
4      steering mechanism or system in the vehicle,
5      right?
6  A.  There's a possibility.
7  Q.  Well, if you'd have been to inspect it, it
8      would have been there, right?
9  A.  Yes.
10 Q.  It would have had a steering system?
11 A.  Yes.
12 Q.  Okay.  Is that something that you would have
13     inspected had you inspected the vehicle?
14 A.  Probably not.
15 Q.  Why not?
16 A.  Because I didn't understand there was any
17     alleged problem with the steering.  From what I
18     understood, and the officer's deposition
19     confirmed and witnesses confirmed, it was a
20     blowout of the right rear tire.  I didn't
21     understand that there was a defect in the
22     steering system or the brake system or any
23     other system that caused the vehicle to go out
24     of control.
25 Q.  But by the time you issued your report, you had

Page 69

1      not received the eyewitness statement,
2      correct?
3  A.  I had not.
4  Q.  And you hadn't received the trooper's
5      deposition yet, had you?
6  A.  No.  But I had the police report, and the
7      statements were contained therein.
8  Q.  Well, there were some preliminary statements
9      contained therein, correct?
10 A.  Correct.
11 Q.  Not the long statement that we just marked as
12     Exhibit 37, right?
13 A.  You are right.
14 Q.  And so let me see if I got this straight.  Even
15     if you had been given an opportunity to inspect
16     the vehicle, you wouldn't have inspected the
17     steering system?
18 A.  Some part, but not the entire steering system,
19     no, I would not have.
20 Q.  Would you agree with me, sir, that a loose or
21     worn steering connection can affect vehicle
22     handling?
23 A.  Depends which connection you're talking about,
24     but it's possible, yes.
25 Q.  If you had had an opportunity to inspect the

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 70

1    vehicle, you could have inspected the braking
2    system, is that correct?
3  A.   Yes.
4  Q.   If you had had an opportunity to inspect the
5    vehicle, you could have inspected any
6    modifications or after-market things that had
7    been done to the vehicle, is that correct?
8  A.   If there had been any, yes, I could have.  It's
9    a possibility again.
10  Q.   Are you aware of any after-market modifications
11    that had been done to the subject vehicle?
12  A.   I'm aware there was a camper insert that the
13    original vehicle probably didn't come with.
14  Q.   Uh-huh.  Anything else?
15  A.   No.
16  Q.   For purposes of your analysis, did you assume
17    everything else on the vehicle was original
18    equipment?
19  A.   Generally, yes, I did.
20  Q.   If you had been afforded an opportunity to
21    inspect the subject vehicle, you could have
22    inspected the suspension system, is that
23    right?
24  A.   Yes.
25  Q.   Do you agree that a worn or loose -- Strike

Page 71

1    that.  Do you agree that there are portions of
2    the suspension system that could be worn or
3    loose that could affect a vehicle's handling or
4    stability?
5  A.   Yes.
6        MR. ROGERS:  Object to the form.  Go
7    ahead.
8  A.   As a possibility, yes, I do agree.
9        MR. TAYLOR:
10  Q.   You did not have an opportunity to inspect the
11    companion tires or the other tires on the
12    vehicle, is that right?
13  A.   If you're asking me personally, no, I did
14    not.
15  Q.   Did anybody that you're aware of?
16  A.   I'm -- I'm not aware of anyone from our office
17    doing so.
18  Q.   Do you have any information with regard to the
19    other three tires that were on the vehicle as
20    to their size?
21  A.   No.  Not readily available, no, I do not.
22  Q.   Do you have any information about the other
23    three tires that were on the vehicle as to
24    their condition prior to the accident?
25  A.   No.  But please understand, we could look at

Page 72

1    the police photographs, and there are
2    photographs taken of the vehicle at the scene,
3    and we could study those and perhaps have some
4    information about the condition of those tires.
5    But I have not done so to date.
6  Q.   Other than looking at the police photographs,
7    do you have any other means of determining the
8    condition of the tires that were on the
9    vehicle other than the subject tire after
10    the accident?
11  A.   Not of which I'm aware, no.
12  Q.   Do you agree that tire wear can be an indicator
13    of tire pressure, balance or alignment?
14  A.   I have to qualify.
15  Q.   Sure.
16  A.   You mean accelerated tire wear, or uneven tire
17    wear?
18  Q.   Sure.
19  A.   Tire wear, even if you you have perfect
20    inflation and perfect alignment, perfect
21    loading, everything else, you're going to have
22    tire wear.
23  Q.   Absolutely.
24  A.   So if I'm understanding your question, you're
25    talking about abnormal tire wear.

Page 73

1  Q.   Well, not so much abnormal tire wear.  Just in
2    terms of how a tire is wearing can be
3    indicative, for instance, of a tire being run
4    underinflated or overinflated, correct?
5  A.   Yes.
6  Q.   You have that general understanding of tire
7    wear?
8  A.   Yes.
9  Q.   And tire wear can be indicative of some type of
10    misalignment that may be going on with a
11    vehicle, correct?
12  A.   Yes.  Toe in or camber, yes.
13  Q.   Absolutely.
14        THE COURT REPORTER:  Excuse me?
15  A.   Toe in and camber.
16        MR. TAYLOR:
17  Q.   Would you agree with me that a vehicle that is
18    misaligned to the point that its tires are
19    wearing unevenly may also be a vehicle whose
20    handling and stability are affected by that
21    misalignment?
22        MR. ROGERS:  Object to the form.  Go
23    ahead.
24  A.   There's a possibility, yes, I agree.
25        MR. TAYLOR:

DENNIS D.  SKOGEN, MSME − 10/13/2016

Page 74

1  Q.  Do you agree that tire size or fitment can also
2      affect vehicle handling?
3  A.  Yes.
4  Q.  Had you been unable to -- Strike that.  Had you
5      been able to inspect the vehicle, you would
6      have been able to investigate the condition and
7      fitment of the pickup's ball hitch and trailer
8      coupler, is that right?
9  A.  Yes.  I could have done that as a
10     possibility.
11 Q.  You agree that an improper connection between
12     the pickup and trailer could degrade vehicle
13     handling?
14 A.  I don't envision how that would, so I'd say
15     it's a possibility, but I don't see how it's
16     going to be likely.
17 Q.  Okay.  Well, let's investigate that a little
18     bit further.  Do you understand or know about
19     the concept of dynamic oscillation?
20 A.  Yes.
21 Q.  What is that?
22 A.  Well, it can be used in a number of terms.
23 Q.  With regard to a trailer?
24 A.  If you're talking about with regard to a
25     vehicle being pulled -- pulling a trailer and

Page 75

1      some -- and I have analyzed cases with some
2      improper loading, overloading, insufficient
3      trailer hitch download, you can get a
4      situation -- or when wind or trailers driven by
5      semis go by, that the trailer can start to go
6      back and forth relative to the vehicle ahead of
7      it or doing the towing.  That would be a
8      dynamic.  It's in motion.
9          And the scientific term would be some
10     oscillation, movement side to side.
11 Q.  Is that a result of dynamic instability?
12 A.  Well, that's a bigger general term.
13 Q.  Of the truck?
14 A.  As a result, it can be a result of many
15     different things that I've seen over the years,
16     and if you want to go into those we can, but it
17     happens when the towing vehicle is too small,
18     the vehicle being towed is too large.
19 Q.  Uh-huh.
20 A.  It can happen if there's an insufficient tongue
21     weight or too much tongue weight.  It can
22     happen based upon the conditions of the roadway
23     surface, slippery roadway surface.  It can
24     happen based upon the braking condition of not
25     only the towing vehicle but the vehicle being

Page 76

1      towed.
2          There are many variables there.  Would
3      not necessarily be dynamic instability, but
4      dynamic instability could occur.
5  Q.  Was there a difference between dynamic
6      instability and divergent instability?
7  A.  I'm not familiar with the term divergent
8      instability.
9  Q.  Okay.  Some of the things that you mentioned
10     that this instability can be caused from are a
11     vehicle that's too small to be pulling what
12     it's pulling, correct?
13 A.  Correct.
14 Q.  A trailer that's too small to be hauling what
15     it's hauling; is that an accurate way --
16 A.  Well, I've had two actually.  I've had a
17     trailer that was so small and had a large
18     tractor on it.  So I suppose that could be.
19         It's usually the trailer is too large
20     for the vehicle doing the towing.
21 Q.  Gotcha.  Okay.
22         And then what about the braking
23     condition; that could be a vehicle condition or
24     a trailer condition?
25 A.  Correct.

Page 77

1  Q.  Did the trailer in this particular case have
2      brakes on it?
3  A.  No.
4  Q.  And I noticed in one of your files there that
5      you included a printout with regard to a
6      certain trailer, it's your vehicle
7      specifications folder, and we can mark this --
8      well, we can mark this entire folder as
9      Exhibit 38 just to put it on the record.
10         (Exhibit 38 marked for
11     identification.)
12 Q.  Within Exhibit 38, there's SKO080, which is the
13     Trailerman 2015 76-by-10 utility trailer with
14     gate, is that right?
15 A.  Yes.
16 Q.  Is that your understanding that that was the
17     trailer that was involved in this accident?
18 A.  Or similar trailer, yes.  I can't say it's the
19     exact same trailer.
20 Q.  By what means did you come up with the
21     information that this was the -- a similar
22     trailer to what was being used that day?
23 A.  I didn't come up with the information.  That's
24     Mr. Peterson or Mr. Zuelhke.  I didn't make
25     that analysis.

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 78

1  Q.  Did anyone from your office ever inspect the
2      trailer that was involved in this accident?
3  A.  Nope.
4  Q.  Do you know what information they were using to
5      base the assessment that this particular
6      Trailerman trailer was a similar trailer to
7      what was being pulled the day of the
8      accident?
9  A.  The police photographs show -- showing the
10     trailer, and then comparing it to what is shown
11     on SKO080, mainly to have measurements to show
12     the trailer and pickup truck on the diagram.
13 Q.  Anything else?
14 A.  No.
15 Q.  Do you know how the ATVs were configured on the
16     trailer on the date of the accident?
17 A.  I have an understanding that they were both
18     loaded one forward and one rearward, one
19     perpendicular to the other.  But I didn't see
20     them the way they were loaded before the
21     accident.
22 Q.  How did you come to that understanding?
23 A.  From reviewing the police photographs, if I
24     recall properly, and then there was some
25     indication about the size of the ATVs and the

Page 79

1      size of the trailer.  I would say that was my
2      preliminary determination.
3  Q.  There's a file folder that we marked as the
4      police -- with the police report and the police
5      photographs.  I was just wondering if you could
6      look at those for me and tell me which of those
7      pictures might have led you to the conclusion
8      that the ATVs were loaded in that manner on the
9      date of the accident.
10 A.  Well, first of all, we didn't mark it, but
11     SKO13 and 14 shows the trailer and its general
12     configuration, shows the ATVs out of it, and I
13     could see that two ATVs wouldn't fight side by
14     side.
15         So it's my opinion that one was
16     probably perpendicular to the other.
17 Q.  Okay.  Had you been able to actually inspect
18     the subject vehicle, you would have been able
19     to investigate the interaction between the
20     tire's tread and the wheel well or other
21     vehicle components, correct?
22 A.  The tire tread and the wheel well?
23 Q.  Yes, sir.
24 A.  You're talking about could I have measured the
25     clearance between the outside surface of the

Page 80

1      tire and inside of the fenders?
2  Q.  No, sir.
3  A.  Possible.
4  Q.  You could have, I'm assuming, right?
5  A.  Yes.
6  Q.  But really what I was talking about is, had you
7      been able to do that, you could have seen if
8      there was any interaction between the
9      separating tread and top belt from the subject
10     tire and the wheel well or other vehicle
11     components?
12 A.  I understand.  Yes.
13 Q.  And do you have an understanding as to why that
14     would be important in a tire failure case?
15 A.  No, I don't.
16 Q.  Had you been able to inspect the vehicle, one
17     of the things you could have inspected was the
18     brake light filaments, is that right?
19 A.  Yes.
20 Q.  And do you agree that the brake light filaments
21     could offer further evidence of the driver's
22     braking inputs during this accident?
23 A.  In this case, probably not.
24 Q.  Why do you hold that opinion?
25 A.  Because the deceleration rate isn't sufficient

Page 81

1      to cause filament deformation, if the filaments
2      are hot, and also taillight filaments many
3      times have cold deformation.
4  Q.  Cold deformation?
5  A.  Yes.  The filaments, as they get older, they
6      tend to sag.
7  Q.  So inspecting the brake light filaments would
8      not have been something that you would have
9      wanted to do on the vehicle?
10 A.  Well, I would have wanted to do it to answer
11     your question, but I wouldn't have done it if I
12     had been inspecting the vehicle.
13 Q.  Had you been able to inspect the subject
14     vehicle, you could have looked for any
15     preexisting damage to the vehicle, right?
16 A.  Yes.
17 Q.  Had you been able to inspect the subject
18     vehicle, you might have been able to download
19     the EDR data from the pickup truck, right?
20 A.  Yes.
21 Q.  And you're aware that GMC was capable of
22     storing accident data, including vehicle speed
23     and seat belt status, right?
24 A.  I'm not sure in 2005 they had speed as a direct
25     output, but they would have had seat belt use as

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 82

1    input -- or as output.
2 Q. Had you been able to investigate or inspect the
3    subject vehicle, you could have looked at the
4    scratch patterns on it, correct?
5 A. Yes.
6 Q. And the scratch patterns can be indicative of
7    the number of rolls and the angle of those
8    rolls, is that correct?
9 A. Yes.
10 Q. And you think there were two and a half rolls
11    in this accident?
12 A. That's my opinion, yes.
13 Q. Okay.  And passenger leading?
14 A. Yes.
15 Q. Other than the information you've already
16    talked about with regard to Exhibit 38, do you
17    know the actual size of the subject trailer, or
18    its dimensions?
19 A. No.  I didn't inspect and measure the accident
20    trailer.
21 Q. Did you make any assumptions as to how much
22    that trailer weighed?
23 A. No.
24 Q. No assumptions on how much it weighed?
25 A. Correct.

Page 83

1 Q. Did you make any sort of determination as to
2    how much the ATVs that were being hauled that
3    day weighed?
4 A. No.
5 Q. Did you do any analysis to determine how much
6    the cooler that was being hauled in the trailer
7    may have weighed that day?
8 A. No.
9 Q. Did you do any sort of analysis of how much
10    weight the loaded trailer would have imparted
11    to the pickup's hitch?
12 A. No.
13 Q. Did you do any determination as to how much the
14    camper weighed?
15 A. No.
16 Q. Did you make any determination as to how the
17    camper would have affected the center of
18    gravity of the vehicle?
19 A. I didn't study it, but I have an opinion.
20 Q. What's that opinion?
21 A. It would raise the center of gravity of the
22    truck as a total assembly.
23 Q. Why?
24 A. Because when you put a camper on the back,
25    you're -- the center of gravity of the

Page 84

1    camper is higher than the center of gravity
2    of the truck without the camper, so you'd
3    raise the center of gravity of the truck
4    somewhat.
5 Q. Does a raised center of gravity increase a
6    vehicle's propensity to roll over?
7 A. All things being equal, yes.
8 Q. Did you do any analysis of how the axle weights
9    on the truck were altered due to the hitch
10    weight?
11 A. Altered from what?
12 Q. Curb weight?
13 A. Okay.  No.  I haven't studied the loading on
14    each of the axles of the truck, nor on the
15    trailer.
16 Q. Did you develop any sort of opinion as to --
17    Strike that.  Do you know what the vehicle's
18    gross vehicle weight rating was?
19 A. From the serial number, and that's on SKO079
20    contained in Exhibit 38, the letter H in the
21    serial number indicates 9,001 pounds to 10,000
22    pounds GVWR.  So that's the gross vehicle
23    weight rating.
24 Q. So 9,000 to 10,000?
25 A. Correct.

Page 85

1 Q. Is there a gross axle weight rating in there?
2 A. Not that I see, no.
3 Q. Do you know what the gross axle weight rating
4    was for each of the axles on this particular
5    vehicle?
6 A. Contained on Exhibit -- or in Exhibit 38, make
7    reference to Expert AutoStats, SKO081, it says
8    that the -- gives a curb weight at 5,485, and
9    it gives a gross vehicle weight of 9,200, and
10    it talks about a curb weight distribution of 60
11    percent on the front axle, and 40 percent on
12    the rear axle.  So one would have to do the
13    multiplication to get the axle load.
14 Q. So the rear axle gross axle weight rating would
15    be 40 percent of 9,200?
16 A. No.  That's the curb weight distribution.  It
17    doesn't say rating per se in any of the
18    documents that I have.
19 Q. Okay.  So can you tell us again what the gross
20    axle weight rating was for the rear or the
21    front axle on this vehicle?
22 A. No.
23 Q. In that -- Those stats that you have in front
24    of you, there's -- the pickup's track width is
25    also in there, is that correct?

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 86

1   A.   Yes.
2   Q.   And it looks like that you come up with 64
3        inches for the front and 65 inches for the
4        rear, is that correct?
5   A.   Correct.
6   Q.   Do you believe that a vehicle's track widths
7        are important to analyzing its lateral
8        acceleration capabilities?
9   A.   It could be one of the factors of many factors
10       involved.
11  Q.   Was there any other reason why the track width
12       of the vehicle was important for your analysis?
13  A.   It wasn't important for my analysis, but we
14       used the specifications to make the model truck
15       for the drawing.
16  Q.   Well, could the vehicle's track width have a
17       bearing on how the vehicle might respond to a
18       tire disablement?
19  A.   In theory.  It's possible, I expect.
20  Q.   Have you done any sort of analysis of the
21       literature and testing related to tire failures
22       and how they affect vehicle handling?
23  A.   For purposes of this case, I saw
24       Mr. Beauchamp's report, and he had a number of
25       articles.  I independently for purposes of this

Page 87

1        case made no such study.
2             The topic has arisen in prior cases,
3        however, but I don't remember the context,
4        whether I was -- most of the time I reconstruct
5        the accident.  Other people talk about the
6        tires.
7   Q.   Okay.  And I guess this is sort of where we'll
8        get down to brass tacks here in your testimony.
9        Do you intend to offer opinions as to how and
10       why the vehicle moved in the manner in which it
11       did following the tire failure?
12  A.   Yes.
13  Q.   Okay.  Would you consider that the field of
14       vehicle dynamics?
15  A.   It would be part of vehicle dynamics, I would
16       say, but here we have testimony of what the
17       vehicle did, or witness observations of what
18       the vehicle did.  We have the tracks and the
19       path.  I have that on my drawing, what the
20       vehicle actually did.
21  Q.   Okay.  But just in terms of your opinions in
22       this case, have you done any type of research
23       or analysis of other people's research related
24       to the effect that a tire failure may have on a
25       vehicle traveling at highway speeds?

Page 88

1   A.   No.
2   Q.   Let's go back to the camper trailer for just a
3        minute.
4   A.   Excuse me.  It wasn't a camper trailer.  It was
5        a camper insert on the pickup and then a
6        trailer on the back.
7   Q.   Fair enough.
8        And I'm sure you know the difference, but
9        probably misspoke.
10  Q.   I did misspeak.  Sorry.
11            This vehicle was hauling a trailer
12       that had two ATVs on it, correct?
13  A.   Yes.
14  Q.   In addition to that, it had a pop-up camper
15       in the bed of the pickup slid in there,
16       correct?
17  A.   A camper insert, yes.
18  Q.   Do you know what was contained inside that
19       camper insert?
20  A.   I understood some testimony by the passenger
21       that there were supplies for them going and
22       staying overnight, but I don't know the details
23       of what those contents were.
24  Q.   Sure.  And he testified that he didn't actually
25       help load it, correct?

Page 89

1   A.   Correct.
2   Q.   So he wasn't exactly familiar with what was in
3        the camper, correct?
4   A.   Correct.
5   Q.   Do you intend to offer any opinions in this
6        case with regard to how much load there was on
7        the axles of this vehicle at the time of the
8        accident?
9   A.   Not without further information, no, I do
10       not.
11  Q.   Did you do any investigation to determine the
12       year, make or model of that slide-in camper?
13  A.   No.
14  Q.   Do you have an opinion as to how much that
15       slide-in camper weighed?
16  A.   No.
17  Q.   Do you have an opinion as to how the weight
18       distribution on the vehicle on the date of this
19       accident may have affected the pickup's
20       response to a tire disablement?
21  A.   No.
22  Q.   I noticed in your information that you
23       inspected the subject tire?
24  A.   Yes, I did.
25  Q.   Was that you personally?

DENNIS D.  SKOGEN, MSME - 10/13/2016

Page 90

1  A.  Yes.  Well, Mr. Peterson did, but I also did,
2      and if you look at the inspection notes
3      contained in Exhibit 35, you'll find SKO143
4      which are my notes of September 22nd, 2015 when
5      I inspected the subject tire.
6  Q.  What date was that?
7  A.  September 22nd, 2015.
8  Q.  Did you just inspect it that one time?
9  A.  It was at our office.  I wouldn't rule out
10     looking at it the day before or several days
11     later.
12 Q.  Sure.
13 A.  But September 22nd is when I made the notes.
14 Q.  And a number of photographs were taken of the
15     subject tire and the tread piece, is that
16     right?
17 A.  Yes.
18 Q.  Were those taken by you or Mr. Peterson?
19 A.  I took the photographs of September 22nd, 2015.
20     He may have taken others at another time.
21 Q.  Was there anything in particular about your
22     inspection of the subject tire that affected
23     your opinions in this case?
24 A.  No.
25 Q.  Was there anything that you found on the

Page 91

1      subject tire that you believe validates or
2      supports any of the opinions that you intend to
3      offer in this case?
4  A.  Not beyond the fact that the tire had failed,
5      and I was preserving the condition of the tire
6      when we had it, and we know the tire failed at
7      the time of the accident.
8  Q.  And the reason I'm asking, there seem to be a
9      large number of pictures of the tire.  I just
10     want to make sure, is there anything in
11     particular that you photographed on the tire
12     that you believe was indicative of a trait that
13     you want to share with the jury that supports
14     your opinions or lends credence to your
15     opinions?
16 A.  Not only there's a tread separation, there was
17     a piece separated from the carcass of the tire.
18     But no.  Nothing else.
19 Q.  You also inspected the wheels from the vehicle,
20     is that right?
21 A.  I did not.  Mr. Peterson did.
22 Q.  You personally did not inspect the wheels?
23 A.  Not that I recall, no.
24 Q.  You had indicated earlier that you were unaware
25     of any portion of the vehicle that was not

Page 92

1      original equipment, and I don't want to
2      misquote you, but do you recall me asking you
3      those questions?
4  A.  I do.  And I indicated that certainly the
5      trailer and certainly the camper were not
6      original equipment.
7  Q.  Sure.  Were the wheels that were inspected by
8      your office original General Motors equipment
9      that came with this vehicle?
10 A.  I don't know that to be a fact one way or the
11     other.
12 Q.  Do you know if the tire was the original
13     equipment tire that came with this vehicle?
14 A.  No.  I don't know one way or the other.
15 Q.  Do you know if the tire that you inspected that
16     was on the right rear of this vehicle on the
17     date of the accident was a size recommended by
18     General Motors for that vehicle?
19 A.  I made no such study, so I don't know one way
20     or the other.
21 Q.  Just to be clear, you're not going to offer any
22     opinions with regard to how or why the subject
23     tire failed, is that correct?
24 A.  Beyond the general, I understand there's a
25     tread separation.  Details?  No.  That's not my

Page 93

1      area.
2  Q.  Do you believe that the tire lost its air
3      pressure while the vehicle was still on the
4      paved surface?
5  A.  Yes.
6  Q.  What's the basis of that opinion?
7  A.  Well, there are a number of bases.  First of
8      all, we have witness testimony that were
9      following.  Then the piece of the tire was
10     found before and up the road from where the
11     tire marks go off into the median.  Certainly
12     the vehicle lost control in my opinion as a
13     result of the tire failure.
14         So those would be sufficient
15     reasons.
16 Q.  And again, just to be very specific, I was
17     really just talking about the fact that the
18     air-out occurred on the roadway.  Is there
19     anything in particular in your investigation
20     that you're relying upon that shows that the
21     tire lost its air while the vehicle was still
22     on the roadway?
23 A.  I'm not sure I understand.  You're talking
24     about some mark on the roadway?
25 Q.  Anything?

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 94

1   A.   Oh, I'm not aware of a physical mark on the
2        roadway that I've seen that shows the -- let's
3        say the rim down to the pavement, if that's the
4        question.
5   Q.   It's part of the question.  It could be part of
6        the evidence.  I don't know.  I was asking you
7        a very open question.  Is there anything about
8        your investigation, whether it be the wheel,
9        the tire, the scene, that tells you that the
10       vehicle lost -- strike that, that the tire
11       lost its air pressure while still on the
12       roadway?
13  A.   And again, you could have a tread separation as
14       I'm understanding the question where there's
15       still air in the tire.
16  Q.   Absolutely.
17  A.   I don't have physical facts one way or the
18       other on that aspect.
19  Q.   Okay.  In your years of offering testimony with
20       regard to consumer products, can you agree with
21       this statement; the mere fact that a product
22       fails does not necessarily mean that it's
23       defective?
24  A.   I agree.
25  Q.   Would you look at Exhibit 26, your report for

Page 95

1        me, please, sir?
2   A.   I have it in front of me.
3   Q.   Great.  Are there any drafts of this report?
4   A.   No.  But I would tell you that when I dictate
5        the report and it's typed up by Mary Stoflet, I
6        proofread it and use a red pen or whatever, or
7        make corrections on the computer.  I sometimes
8        do it that way.
9             So this should be the final product,
10       but there would probably have been in the Word
11       program that we use some original probably
12       typos, et cetera, in that original draft.
13  Q.   Did you save those other drafts?
14  A.   No.
15  Q.   In between your original dictation and this
16       final report, did you have any conversations
17       with anyone representing Mr. Below about your
18       opinions that you intended to express?
19  A.   No.
20  Q.   Did you supply the report to them for review
21       prior to finalizing it?
22  A.   No.
23  Q.   Does this report contain a complete statement
24       of all of the opinions that you intend to offer
25       in this case, without me asking you some big

Page 96

1        open question that might lead you to offering
2        something new?
3   A.   Yes, understanding what my assignment was.
4   Q.   Uh-huh.
5   A.   Yes, understanding what the questions were that
6        were going to be asked of me by Mr. Rottier or
7        someone in his office.
8             So yes.  All of my opinions are
9        contained in Exhibit 26 with, as you just
10       stated, the exception if there's some question
11       that I hadn't anticipated that you might ask
12       that I wouldn't have covered in the report.
13  Q.   Great.  So you stand by your report?
14  A.   Absolutely.
15  Q.   It's complete?
16  A.   Yes.
17  Q.   And it was -- Strike that.  Did you have any --
18       Did you need to review anything else prior to
19       your February 29th, 2016 report?
20  A.   Other than anything else I had --
21  Q.   Was there anything else that you needed to
22       review prior to issuing this report?
23  A.   No.
24  Q.   Okay.  Have you asked -- been -- Strike that.
25       Have you been asked to do anything else since

Page 97

1        you issued your report in February of 2016?
2   A.   Yes.
3   Q.   What else have you been asked to do?
4   A.   I received the statement, the two depositions,
5        and the exhibits attached to them.  Although
6        I wasn't asked to read those materials, I did
7        so, and I also received Mr. Beauchamp's
8        materials.
9             And again, although I wasn't asked, I
10       did review those.
11  Q.   Anything else?
12  A.   No.
13  Q.   Did Mr. Peterson contribute to this report?
14       Bless you.
15  A.   No.  But please understand, Mr. Peterson
16       assisted me in the inspection, and you can see
17       in the billing Mr. Zuelhke and Mr. Bingen
18       helped with the drawing, all of that sort of
19       information.
20            But I wrote the report.  These are my
21       words.  No one else.
22  Q.   Great.  You wrote it word for word?
23  A.   Yes.
24  Q.   That was really the better question.
25  A.   You're welcome.

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 98

1   Q.   Are you doing okay, or do you want a break?
2   A.   I'm fine.
3   Q.   Okay.  Me too.  Everybody else?
4             We're going to talk about Exhibit 36,
5        which is your diagram of the accident, okay?
6   A.   Yes.
7   Q.   Do you have a smaller version of this that you
8        can look on with?
9   A.   I do.  It was attached to the report.  It's
10       SKO077, which is part of Exhibit 26, although
11       it's kind of a small scale for my old eyes.
12       But I'll work with it.
13  Q.   Well, you're welcome to look at 36 at any point
14       in time.  I need to understand better some of
15       the markings that are on Exhibit 36, and let's
16       basically start from the top of the page and
17       work our way down, okay?
18  A.   Yes.
19  Q.   The first thing that we come to that is part of
20       the diagram is a dotted line or dashed line.
21       What is that?
22  A.   The gravel shoulder edge.
23  Q.   Uh-huh.  Do you have any indication in your
24       notes how far the roadway drops off from the
25       edge of that gravel to the unimproved area of

Page 99

1        the roadway?
2   A.   Not that I recall.  It's not much of a dropoff,
3        but I don't recall what it is.
4   Q.   Is it severe?
5   A.   No.
6   Q.   Okay.  So you have a graveled area, and then
7        what's the next line that we see there, that
8        solid black line?
9   A.   That's the edge of the paved shoulder.
10  Q.   And then the next double line there?
11  A.   That's the -- I'll call it the fog line, or the
12       right side line for -- that stage vehicles
13       northbound.  It would be the east edge of the
14       through lines.
15  Q.   It's called the fog line, you say?
16  A.   We sometimes call it that, yes.
17  Q.   Is that a white line typically?
18  A.   Yes.
19  Q.   What's the next set of lines?
20  A.   That represents the center line of the two
21       divided northbound lanes.
22  Q.   And I'm having difficulty understanding.
23       There's a -- appears to be almost a solid line,
24       and then there's some dashes underneath that
25       partial solid line.  Do you know why it was

Page 100

1        configured in that manner?
2   A.   Yes.  Because we studied the dashed lines
3        through the area of the accident, and didn't
4        place them all on the drawing further down the
5        road nor in the other lanes.  We put what's
6        traditionally a center line marking, which is a
7        long line with a small dash.
8   Q.   The next line that we come to is what?
9   A.   That's the west edge of the paved portion of
10       the through lanes.
11  Q.   That's the yellow line?
12  A.   Yes.
13  Q.   And then what's after the yellow line?
14  A.   Then you have the edge of the paved surface,
15       which is the shoulder.
16  Q.   Okay.
17  A.   And then you have the dashed line, which is the
18       edge of the gravel shoulder.
19  Q.   And then we have the center median, is that
20       right?
21  A.   Yes.  It's just grass.
22  Q.   All right.  There's some photographs here that
23       someone has placed on Exhibit 36.  First off,
24       who did Exhibit 36?
25  A.   That's a combination of Mr. Peterson,

Page 101

1        Mr. Zuelhke, Mr. Bingen and myself.
2   Q.   Who decided where to place the photographs?
3   A.   I would say Mr. Peterson probably put the
4        photographs.
5   Q.   Did he do some photogrammetry on this?
6   A.   Not on those photographs, but yes, on larger
7        photographs that are in the file.  You remember
8        we -- that Mr. Peterson measured the rumble
9        strips?
10  Q.   Uh-huh.
11  A.   And then the dashed lines, and you'll find
12       photographs which we already marked where
13       Mr. Peterson made some study to help place the
14       tire marks on the drawing, Exhibit 36.
15  Q.   The -- Going from right to left, the first
16       photograph, which would be the way Mr. Below
17       was headed that day, the first photograph we
18       come to is scene photograph P9, is that right?
19  A.   Yes.
20  Q.   And that shows a piece of tread at the road
21       edge, is that right?
22  A.   Yes.
23  Q.   And Mr. Below was headed westbound, right, on
24       94 that day?
25  A.   Correct.  Although please understand, at that

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 102

1      location it's basically north.
2   Q. Basically north/south at that point?
3   A. Right.  But we always call it westbound on the
4      interstate there, throughout that travel.
5   Q. We got a lot of that on I-10 going through
6      Texas too, so I'll forgive you.  Can we just
7      call it eastbound and westbound just for --
8      because that's how the roadway is named?
9   A. That's fine.
10  Q. But we'll understand he's going north/south.
11  A. I got it.
12  Q. Okay.  So he's heading westbound on 94, and so
13     we're looking at scene photograph P9, and
14     that's looking in the direction of westbound
15     94, correct?
16  A. Yes.
17  Q. Do you know if that's the piece of tread that
18     was recovered that related to the subject tire?
19  A. Yes.
20  Q. How do you know that?
21  A. By looking at the photographs and studying the
22     piece of tire.
23  Q. The next photograph is scene photograph P11?
24  A. Yes.
25  Q. What was used to orient it to place it at that

Page 103

1      particular spot?
2   A. The dashed center lines, the police
3      photographs, the rumble strips.
4            And by the way, the arrows show on the
5      right-hand side, but of course those
6      photographs are taken on the left-hand side of
7      the westbound lanes.  There just wasn't room to
8      put them -- to put them in the median.
9   Q. Sure.  Disturb everything else.
10           The next photograph we come to is
11     scene photograph P12, which is you can begin to
12     see some tire marks going across the solid
13     yellow line, is that right?
14  A. Yes.
15  Q. In any of those tire marks -- Strike that.  Did
16     you determine the marks that we see in scene
17     photograph P12 to be tire marks that were left
18     from the subject vehicle or the subject
19     vehicle's trailer?
20  A. The subject vehicle.  Not so much the
21     trailer.
22  Q. How did you make that determination?
23  A. Because you could trace the tire marks from the
24     pickup truck rather than the tire marks from
25     the trailer through the area of travel of the

Page 104

1      truck.
2   Q. Do you believe that Mr. Below was traveling in
3      the right-hand or the slow lane when the tire
4      began to fail?
5   A. That's my opinion, yes.
6   Q. How do you define yaw?  Yaw, y-a-w.
7   A. It's a motion made by the vehicle, and if you
8      want it in engineering terms, but in layman's
9      terms basically a vehicle going straight
10     doesn't yaw, but if it starts to rotate without
11     it being turned specifically by the steering
12     wheel, then the vehicle starts to travel down
13     the road in varying degrees of in this case
14     right-side leading.
15           This vehicle is clearly yawing from
16     its tire marks and its rotation through the
17     area where it rolls and to where it comes to
18     rest.
19  Q. So your definition of yaw is a motion made by a
20     vehicle where it rotates without being turned
21     by the steering wheel, is that --
22  A. It can be turned by the steering wheel and
23     steering of the vehicle too.  It's a rotation
24     about the -- if you have a vertical axis
25     through the center of gravity, it's rotation of

Page 105

1      the vehicle around that vertical axis as it's
2      in transition.
3   Q. Can a vehicle recover from a yaw in your
4      opinion, or your -- using your definition of
5      yaw, can a vehicle recover from a yaw?
6   A. A small yaw, yes.  When it gets to any kind of
7      yaw like this, no.
8   Q. When you say this, you're talking about the
9      first image that we see of the Below vehicle on
10     your diagram?
11  A. Yes.
12  Q. Is it your opinion that the image that we see
13     there at the -- the first image that we see of
14     the Below vehicle, that vehicle is in a yaw at
15     that point?
16  A. Yes.
17  Q. Is that a yaw from which that vehicle could
18     have recovered at that point?
19  A. I doubt it.  I'd say no.
20  Q. Does the placement of the first vehicle on
21     Exhibit 36 and your diagram, is that an
22     indication of where the first physical evidence
23     was found on the actual roadway?
24  A. The tire mark, yes,
25  Q. Which tire mark was first located there?

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 106

1   A.   The right front.
2   Q.   And we see that carrying all the way through
3        into the median area, is that right?
4   A.   Yes.
5   Q.   Okay.  How far back from point of rest is that
6        first tire mark?  Well, let's strike that.
7        Let's start with the trip.  How far back from
8        the trip is that first tire mark?
9   A.   Well, you could measure it on the drawing is
10       the easiest, but in the calculations, that
11       would be location H, and we start as
12       location A.
13  Q.   Where is A?
14  A.   A is the first drawing you just referenced.
15       It's the easternmost portrayal.
16  Q.   Okay.  So it's position A is the --
17  A.   Yes.
18  Q.   The first time in his lane of travel that we
19       see him, right?
20  A.   Correct.
21  Q.   Okay.
22  A.   So if we add the distance up, and you want to
23       go all the way to H?
24  Q.   Let's go to trip.  Yeah.  Is it H?
25  A.   It's about 161 feet.

Page 107

1   Q.   How long do you have his roll distance, 164,
2        something like that, 124?
3   A.   124, correct.
4   Q.   124 roll distance?
5   A.   Yes.  To final rest, yes.
6   Q.   Did you do a speed calculation for Mr. Below's
7        pickup truck at point A on Exhibit 36?
8   A.   At location A, yes.
9   Q.   What did you determine his speed to be at
10       location A?
11  A.   That's the speed I reported in my report,
12       Exhibit 26, at 58 to 63 miles per hour.
13           THE VIDEOGRAPHER:  About five minutes
14       left on disk.
15           MR. TAYLOR:
16  Q.   Okay.  What type of speed calculation did you
17       use; did you use a segment of yaw calculation,
18       did you use like a source of critical speed
19       calculation?  How did you do your speeds?
20  A.   Didn't use critical speed.  But I used
21       conservation of kinetic energy, and as you just
22       said, broke it up into increments and used
23       acceleration, and then took into account that
24       it's yawing at an increasing rate, and then
25       used the rates of deceleration and applied

Page 108

1        those to the distances traveled.
2   Q.   Sure.
3   A.   Conservation of kinetic energy.  It's not a
4        critical speed calculation.
5   Q.   Is there anything wrong with the critical speed
6        calculation?
7   A.   Depends how it's used and what it's used.  If
8        it's --
9   Q.   How about in this arena?
10  A.   In this case, no, you wouldn't use critical
11       speed calculation.
12           And critical speed, make sure we're on
13       the same path or on the same page here, it
14       talks about if you have tire marks created by a
15       vehicle going around a curve, if you can
16       measure the core or the radius of the
17       cornering, you could then calculate the maximum
18       speed if you take into account lateral
19       acceleration limits.
20           Is that what you're talking about?
21  Q.   I am.
22  A.   I hope so.
23  Q.   Did you do any sort of analysis of the lateral
24       acceleration limits on this particular
25       vehicle?

Page 109

1   A.   Well, yes.  There's lateral acceleration as the
2        vehicle is coming around the yaw.  But as far
3        as using critical speed, no.
4   Q.   Gotcha.  Okay.  I think we're on the same page.
5        Good.
6   Q.   What decel rate did you use throughout the
7        increments that we see on Exhibit 36?
8   A.   Well, it certainly varied, but it would be
9        mainly .3 to .46 once you take into account the
10       yaw and the yaw at various rates.  But the
11       maximum was right around .65.  .65  .45 to .55
12       for some of the roll-over event for the last --
13       for the 40 feet, .4 to .5 Gs, those are the
14       absolute numbers, not taking into account the
15       yawing.  And I -- Then I was -- .65 was the
16       highest number that was used.
17  Q.   Okay.  We're going to have to break that down,
18       but I think I'm going to need longer than two
19       minutes, so we'll go ahead and change the
20       tapes.
21  A.   Okay.
22           THE VIDEOGRAPHER:  This is the end of
23       disk No. 1, the deposition of Dennis Skogen,
24       October 13th, 2016, 11:15 a.m.  We're off the
25       record.

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 110

1    (A break was taken from 11:15 to
2    11:28.)
3        THE VIDEOGRAPHER: This is the
4    beginning of disk No. 2 in the continuing
5    deposition of Dennis Skogen, October 13th,
6    2016, 11:28 a.m.  You're on the record.
7        MR. TAYLOR:
8  Q.  Mr. Skogen, are you ready to proceed?
9  A.  Yes, sir.
10 Q.  I want to follow up with you on some questions
11     that I had about Exhibit 36 and see if I
12     understood your earlier testimony.  Okay?
13 A.  Yes.
14 Q.  My understanding is if we start with the most
15     easterly vehicle on Exhibit 36, that that is
16     the one that has been labeled A, is that right?
17 A.  Correct.  In my calculations it's A, but that's
18     the way I think of it as A.
19 Q.  Sure.  And then each of the vehicles that we
20     see in your diagram proceeding westerly would
21     be the next in the alphabet, so the second one
22     would be B, the third one would be C, and so
23     forth?
24 A.  Exactly.
25 Q.  Point of trip vehicle would be H, right?

Page 111

1  A.  I shouldn't say point.  It's an area of trip.
2      So yes, that would be H.
3  Q.  Okay.  And then the final resting is position
4      I, is that correct?
5  A.  It would be.  We call it FRP, final rest
6      position.
7  Q.  Fair enough.  With regard to your speed
8      calculations for the vehicle as it appears on
9      your diagram at position A, you have calculated
10     that at 58 to 63 miles per hour, is that
11     correct?
12 A.  Yes.
13 Q.  And you told us how you did that.  Did you tell
14     us the deceleration rate that you used for that
15     calculation?
16 A.  Well, it varies.  But yes, I did.
17 Q.  Okay.  What deceleration rate did you use at
18     point A on this diagram?
19 A.  It's at .65 is the deceleration rate.
20 Q.  Okay.  Is there a different deceleration rate
21     used for the vehicle as we see it at point B?
22 A.  No.  That would still be .65.
23 Q.  Okay.
24 A.  But again, these are adjusted because the
25     vehicle is going into a yaw, so the effective

Page 112

1      deceleration rate goes down from there.  So if
2      you're talking about the effective deceleration
3      rate from A to B, as an example, it would be
4      .43 to .48 Gs.  And that would be the same from
5      B to C.  From C to D .4 to .45 Gs.  From E to
6      D, .35 to .4 Gs.  From E to F, .28 to .33 Gs.
7      Same deceleration for G to F.  And then G to H,
8      .38 to .43 Gs.
9  Q.  Does your decel -- Strike that.  Do the
10     deceleration rates that you used in your speed
11     calculations take into account any braking by
12     Mr. Below?
13 A.  Yes and no.  In other words, the deceleration
14     rates are based upon the tire marks being left.
15     As the vehicle is yawing, the tires are
16     scribing the marks.  He may have had the brakes
17     on and he may not have, but it's being slowed.
18     The vehicle is being slowed anyway because the
19     tires don't roll sideways.
20 Q.  In terms of trip mechanisms in the median, is
21     it just the soil, or is there a different trip
22     mechanism other than the soil, the gravel?
23 A.  Well, there are a number of factors that cause
24     a vehicle to start to roll.  If you're talking
25     about the soil, I don't recall an object being

Page 113

1      there that was that portion of the trip event.
2          So it would be the soil and the tires
3      and digging into the soil on the right side,
4      yes.
5  Q.  Did you -- Excuse me.  Did your colleague
6      measure the depths of those marks in the
7      median?
8  A.  Not that I recall.
9  Q.  Do you have an opinion as to whether or not the
10     trailer began to roll first, or the truck?
11 A.  I would say the truck began to roll or tip
12     first before the trailer.
13 Q.  Do you know how the ATVs were secured to the
14     trailer?
15 A.  Not of my own personal knowledge.  And I have
16     the passenger.
17 Q.  What did he say about how the ATVs were secured
18     to the trailer?
19 A.  He said that Mr. Below had strapped them down
20     or tied them down before he had gotten into the
21     pickup truck -- before the passenger got in the
22     pickup truck
23 Q.  What was his speed at trip?
24 A.  In the area of the trip, I have 41 to 45 miles
25     per hour.

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 114

1   Q.   Did you do an analysis of the roll rate?
2   A.   No, I didn't.
3   Q.   Did you make a determination as to where
4        Mr. Below was ejected from the vehicle?
5   A.   Assuming he was ejected, no, I didn't.
6   Q.   Are you aware of whether or not he was
7        ejected?
8   A.   Well, I understood there's some observations
9        concerning that aspect, but I made no
10       evaluation of whether he was or wasn't ejected,
11       and if he was where he was ejected.
12  Q.   Was this scale diagram in part generated by a
13       computer obviously?
14  A.   Yes.
15  Q.   Did the computer assist in any manner in
16       determining the positions of the vehicle?
17  A.   Not really.  We take the computer, we put the
18       tire marks on, and that's from the photographs
19       and our survey.
20            As is the drawing -- base drawing,
21       Exhibit 36, you see we used an aerial
22       photograph.  As it turns out, it was taken not
23       long after the accident, so there were still
24       some tire marks that show in the aerial
25       photograph.

Page 115

1        Then we place the vehicles on the
2        diagram matching the tire marks, and the
3        computer doesn't do it, we do it, but we use
4        the computer AutoCAD to do so.
5             And then I make calculations, and in
6        this matter, Exhibit 34 would show the
7        calculations we made.  They were made with a
8        spreadsheet.
9   Q.   Okay.  Have you been given any information
10       regarding the history of the vehicle prior to
11       the accident?
12  A.   No.
13  Q.   Have you been given any information with regard
14       to the history of the right rear tire prior to
15       the accident?
16  A.   No.
17  Q.   Do you know anything about the air pressures
18       that were in the tires on the date of the
19       accident?
20  A.   You say anything.  I don't know what the
21       pressure settings were.  I understand that they
22       were inflated.
23  Q.   Right.
24  A.   Prior to the accident.  Beyond that, I have no
25       knowledge.

Page 116

1   Q.   Have you ever served as an expert on an
2        accident involving a passenger vehicle that had
3        sustained a tread separation prior to today?
4   A.   Yes.
5   Q.   How many times?
6   A.   I've never kept track.  Far as a
7        reconstruction, probably 30 times, maybe as
8        many as 40 times over the years.
9   Q.   Has it always been your opinion that a tread
10       separation event has led to a loss of control
11       in those accidents where a tire failure was
12       involved?
13  A.   No.
14  Q.   So you would agree with me that the mere fact
15       that a tire fails in service does not mean that
16       a loss of vehicle control will necessarily
17       follow?
18  A.   I agree with that, but that's not what I
19       testified in those other cases.  The one case
20       was a tread separation after there was an
21       accident.  The tire was damaged because the
22       fender was shoved into it and there was a tread
23       separation.  So that's to which I was
24       referring.  Not the question you just asked.
25  Q.   I've actually had a client sued for that

Page 117

1        before.  Can you believe that?
2             In the other instances, have you
3        testified that the tread separation event
4        ultimately led to a loss of control?
5   A.   Where that was part of the reconstruction or
6        asked that question, yes.
7   Q.   So you're of the belief that a tread separation
8        event can lead to a loss of control?
9   A.   Yes.
10  Q.   But you're also of the belief that a tread
11       separation event at highway speeds does not
12       necessarily have to lead to a loss of
13       control?
14  A.   I agree.
15  Q.   There are factors that contribute as to whether
16       or not a tire failure at highway speeds will
17       lead to a loss of control in an accident, is
18       that true?
19  A.   Yes.
20  Q.   And identify for me then those factors that you
21       believe contribute to whether a tire failure at
22       highway speeds will lead to a loss of control.
23            MR. ROGERS:  Object to form.  Go
24       ahead.
25  A.   Well, the ones that can be identified I would

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 118

1  say would be the type of vehicle, the size of
2  the vehicle, the speed of the vehicle, the
3  environmental conditions, the type of roadway,
4  and if I didn't say it the speed of the
5  vehicle, the surfaces encountered, the driver's
6  skill.
7          One of the most critical ones of
8  course is driver expectation.  Tire failure is
9  not something that happens every day.  It's for
10 the most part a surprise event.  Could be --
11 Well, would be an emergency in my definition.
12 So how that person reacts to emergency would
13 vary from individual to individual, and from
14 situation to situation.
15         I probably haven't put all the
16 variables in there, but at least those are a
17 large number.
18         MR. TAYLOR:
19 Q.  Some of the ones you told us were type of
20     vehicle, size of vehicle?
21 A.  Yes.
22 Q.  Speed?
23 A.  Yes.
24 Q.  Roadway conditions or surfaces?
25 A.  Yes.

Page 119

1  Q.  And the driver's skill and reaction?
2  A.  Correct.
3  Q.  Okay.
4  A.  That would be some.  And then of course
5      expectation, knowledge if there's going to be a
6      failure.  Those would all be driver factors and
7      situation factors.
8  Q.  Have you done any testing that relates to the
9      effect of a tire failure, whether it be a tread
10     detachment or a blowout, on vehicle handling or
11     controllability?
12 A.  Have I done a test?
13 Q.  Yeah.
14 A.  No.
15 Q.  Have you reviewed any testing with regard to
16     this case as to the effects on vehicle handling
17     or controllability when there's been a tire
18     failure?
19 A.  I saw the documents that Mr. Beauchamp had and
20     what he referenced.  I have seen some of those
21     documents over the years also.
22 Q.  Okay.
23 A.  But I didn't research any particular documents
24     for this case.
25 Q.  Okay.  Are you relying on any of the articles

Page 120

1  cited by Mr. Beauchamp in his report to support
2  your opinions in this case?
3  A.  No.
4  Q.  Would you agree with me that the research
5      indicates that a tire disablement such as a
6      tread separation will cause drag and lateral
7      movement to a vehicle?
8          MR. ROGERS:  Object to the form of the
9      question.
10 A.  That it always will, or if it can?  It can
11     certainly, yes.
12         MR. TAYLOR:  What was the objection?
13 I'm sorry.  What's the nature of the objection?
14         MR. ROGERS:  It was incomplete, and it
15 calls for speculation.
16         MR. TAYLOR:  Okay.  Let me ask it
17 again, let me try and clean it up.
18 Q.  You're aware, sir, that there's scientific
19     literature that a tread separation event on the
20     right rear of a vehicle will cause drag on that
21     vehicle, correct?
22 A.  I expect there probably is something of that
23     nature.  I don't have an article in mind,
24     however.
25 Q.  Are you aware of -- Strike that.  Are you aware

Page 121

1  of the scientific literature available related
2  to the lateral movement a vehicle would expect
3  to encounter during a tread separation event?
4  A.  I don't have that in mind, no.
5  Q.  Would you agree or disagree with the statement
6      that the research indicates that vehicle
7      control is typically not compromised to the
8      point that a vehicle becomes uncontrollable
9      simply due to a tread separation event?
10         MR. ROGERS:  Object to the form.
11         THE WITNESS:  I hate to do this, but
12 could you read that back, please?
13         (Question at Page 121, Line 5 read
14 aloud by the reporter.)
15 A.  I have no opinion in that regard.
16         MR. TAYLOR:
17 Q.  In your report, you -- the summary, you
18     indicated that the tire failed suddenly.  What
19     do you mean by suddenly?
20 A.  That as the witness described, that the tire --
21     sometimes people call it blew out, but failed,
22     separated, failed to hold the vehicle up.  The
23     passenger eventually said that he felt his side
24     of the pickup drop down.  It wasn't my
25     understanding this was a slow loss of tire

DENNIS D.  SKOGEN, MSME – 10/13/2016

1    pressure.
2         Again, the witness said that he saw
3    pieces or felt pieces of tire hitting their
4    vehicle.  So it's -- To me it's a sudden
5    failure of the tire.
6  Q.  Do you have an opinion that you intend to
7    express as to where in the accident sequence
8    the tread and top belt began to detach from the
9    subject tire?
10 A.  I don't have a distance to the east as we've
11   been asking from location A.
12 Q.  Do you have an opinion that you intend to offer
13   as to where the tire began to throw rubber
14   pieces prior to the orientation of the vehicle
15   that we see as Exhibit -- as A on Exhibit 36?
16 A.  Not without further information or assumptions
17   being made by -- or being asked to be made by
18   me.
19 Q.  As part of Exhibit 36, there's some photographs
20   here, the scene photograph, P9.  Here.  I'll
21   show you.
22 A.  Yes.  And that's the same as the photograph on
23   the top.
24 Q.  Sure.  P9?
25 A.  Yes.

1  Q.  And then there's also down below, separated
2    part of the tire from the right rear of the
3    Below GMC as located on the scene photographs?
4  A.  Yes.
5  Q.  Would it be your opinion that that's precisely
6    where the tread and top belt piece that was
7    located there detached from the tire?
8  A.  No.
9  Q.  Could have traveled further west along the
10   roadway, right?
11 A.  Right.  It detached further to the east,
12   true.
13 Q.  Okay.  Did anybody make any determination that
14   the area in the median that is noted to be
15   small pieces of tire and then the date, May
16   14th, 2014, were tire pieces that related to
17   the Below vehicle?
18 A.  I'm not certain of that.  I understood they
19   were related to the Below vehicle, but I'd have
20   to go back and ask Mr. Peterson and do further
21   study, as I replied to the question earlier.
22 Q.  Sure.  As you sit here today, you can't testify
23   that those small pieces of tire located in May
24   of 2014 were actually related to the Below
25   vehicle, correct?

1  A.  True.
2  Q.  Can we agree as a general proposition of
3    physics that as the tread separation was
4    occurring on Mr. Below's right rear tire, that
5    there would have been some amount of drag
6    impart -- imparted to his vehicle?
7  A.  Yes.
8  Q.  Can you quantify for the ladies and gentlemen
9    of the jury what you believe to be the amount
10   of that drag that would have been imparted to
11   the vehicle?
12 A.  No.
13 Q.  After the right rear tire completed its tread
14   and top belt detachment, would that drag on the
15   right rear side of the vehicle have continued?
16 A.  Yes.
17 Q.  Why?
18 A.  Because the tire is not in its original
19   condition.  When its tread is separated, I
20   would expect that the drag as we've been
21   describing it would be the same or increase or
22   decrease over the distance traveled.
23        Of course there's going to be a time
24   when the vehicle is rolling, and it doesn't
25   matter anymore.

1  Q.  Sure.  And let's talk about the tread
2    separation event.  As the tread is detaching
3    from the tire, do you agree with me that
4    there's increased  drag on the vehicle from
5    that right rear position?
6  A.  Yes.
7  Q.  Is it your opinion then based on the laws of
8    physics that once that tread and top belt
9    detaches, that that drag that was imparted
10   because of the detaching tread and top belt
11   remains the same, or does it dissipate?
12 A.  Well, I can't say that it remains exactly the
13   same.  I would expect it doesn't go away and
14   vanish, but there would still be some drag.  I
15   can't tell you whether it's increasing or
16   decreasing over the length of travel.
17 Q.  Okay.  So how about in relation to the other
18   three tires that still have their tread and top
19   belt on them; would there be more or less drag
20   on that right-hand side?
21 A.  More drag on the right rear side.
22 Q.  After the tread and top belt detach?
23 A.  Yes.
24 Q.  By what means?
25 A.  By the means of the tire doesn't have the same

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 126

1  rolling circumference that it had.  It doesn't
2  have the same configuration.  It's
3  deteriorated.  Whether it's deflated, we talked
4  about that before, it's not rolling in the
5  normal fashion as the other three, so in my
6  opinion there would be increased drag at the
7  right rear.
8  Q.  Fair enough.  Let me ask you a better question
9      then.  If the tire does not immediately deflate
10     after the tread and top belt detaches, is it
11     still your opinion that there is increased drag
12     on that right rear position as it relates to
13     the other three tires?
14 A.  Most likely, but I can't say to a certainty
15     without knowing how much it separated, over
16     what length of the tire, and what -- whether
17     the tire is still inflated or not.
18 Q.  No.  I wanted you to assume with me the tire
19     was still inflated.
20 A.  Oh, I'm sorry.  I didn't understand.
21 Q.  And that the tread and top belt have completely
22     detached.
23 A.  All the way around?
24 Q.  360, just like we found it.
25 A.  Then I expect there's increased drag.

Page 127

1  Q.  There's still increased drag on that right rear
2      position?
3  A.  In my opinion, yes.
4  Q.  And what's the basis of that opinion?
5  A.  Because as I described a minute ago, you start
6      out with four tires inflated with all tire
7      treads in place, and then the right rear is
8      affected, suddenly affected, you asked me to
9      assume it's still inflated, but that the tread
10     is separated, and that in my opinion causes
11     increased drag at the right rear.
12          To quantify it, I haven't done so.
13 Q.  Sure.  And certainly if the tire is deflated at
14     that point, there's going to be increased drag
15     on that right rear tire, correct?
16 A.  Correct.
17 Q.  For the ladies and gentlemen of the jury, if
18     there's drag on the right rear of a GMC pickup
19     truck like this one, what does that mean in
20     terms of the direction of the vehicle?
21 A.  Well, the direction of the vehicle continues to
22     go straight.  It might have some pull to the
23     right.
24 Q.  You would expect a little pull to the right,
25     correct?

Page 128

1  A.  Yes.  I would expect there would be some pull
2      to the right.
3  Q.  So you would expect there to be some pull to
4      the right as a result of the tread and top belt
5      detaching, and then even after it detaches, in
6      your opinion?
7  A.  Well, both.
8  Q.  I understand that that's your opinion, right?
9  A.  Yes.
10 Q.  Just restating it?
11 A.  Yes.
12 Q.  Okay.  So your opinion and analysis of this
13     accident sequence is that Mr. Below would have
14     experienced a right rear drag from the right
15     rear tire failure all the way through the
16     accident sequence?
17 A.  No.  I can't say that.  I can't say that he
18     would have experienced it.  The vehicle
19     experiences.
20 Q.  Fair enough.
21 A.  The right rear experiences.  He would know
22     something is wrong, but certainly, as an
23     example, the vehicle is rolling over, I doubt
24     that he knows that the right rear wheel is
25     dragging.

Page 129

1  Q.  Sure.  Let's talk about while the vehicle is
2      still on the roadway.  Would the vehicle, in
3      your opinion, while the four tires are still
4      on the roadway, have experienced a right rear
5      drag?
6  A.  Yes.
7  Q.  And that right rear drag would have been
8      essentially trying to redirect the vehicle to
9      the right, is that correct?
10 A.  Yes.
11 Q.  Ultimately the vehicle went off the roadway to
12     the left, is that right?
13 A.  Yes.
14 Q.  Should have said is that correct.  It's going
15     to get confusing with the right, left.
16 A.  Okay.  It's correct.  Go to the left.  That's
17     what it did.
18 Q.  You bet.
19          Do you have an opinion as to -- Strike
20     that.  In order for the vehicle to get off the
21     roadway to the left, there had to have been a
22     left steer input by Mr. Below, is that correct?
23 A.  I agree.
24 Q.  Do you have an opinion as to the magnitude of
25     that steer input by Mr. Below?

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 130

1  A.  No.
2  Q.  Do you have an opinion as to the number of
3      steer inputs that Mr. Below imparted to the
4      vehicle prior to going off to the left?
5  A.  Only from what I understood testimony to be by
6      the passenger and the witness, that the vehicle
7      went to the right slightly, and then came back
8      to the left.  So that would indicate one
9      steering input.
10         But I can't say for sure.  Mr. Below
11     may have been fighting it all the way and
12     trying to recover the vehicle.
13 Q.  Certainly the passenger indicates that there
14     was a pull to the right and then a steer to the
15     left, is that correct?
16 A.  Yes.
17 Q.  And you don't dispute that, do you?  That
18     comports with the laws of physics, doesn't it?
19 A.  No, it doesn't.  You could have a pull to the
20     right and go straight.  You could have a pull
21     to the right and go off to the right.  I'm
22     just --
23 Q.  Sure.
24 A.  I don't disagree that that's what the witness
25     says.

Page 131

1  Q.  Sure.
2  A.  And that does happen where vehicles go to the
3      right, they go back to the left.  Sometimes
4      vehicles go to the left, they come back to the
5      right.  That does happen in some accidents.
6  Q.  Sure.  But in your analysis, with the drag
7      continuing on that right rear position on this
8      vehicle, both during and following the tread
9      separation event, had there been no steer
10     input, the vehicle simply would have gone off
11     to the right-hand side of the road, correct?
12 A.  Yes.  It did go off to the right-hand side of
13     the road.
14 Q.  Right.  And had there been no steer input to
15     the left by Mr. Below, it would have continued
16     to go to the right based on your analysis and
17     understanding of the accident, correct?
18 A.  Probably.  I can't say for certain though.
19 Q.  Well, more likely than not, correct?
20 A.  Well, because you go -- you start to get -- if
21     you're going to the right, you get onto the
22     shoulder and to the grass.  I can't say that it
23     would continue to go to the right throughout
24     the event that you're hypothesizing where it
25     went to the right originally.

Page 132

1  Q.  What would have caused it to go to the left
2      without a steer input?
3  A.  Braking, as an example, and the right rear
4      wheel is not going to brake as well, and you
5      have both sides braking and tire surfaces on
6      the left that are on the pavement.  The right
7      rear goes into the gravel and the grass.
8          There could be a number of variables
9      in that hypothetical.  It wouldn't necessarily
10     make it go to the right, or make it go
11     straight, or go back to the left.
12 Q.  And in your opinion, Mr. Below did not brake to
13     a severity that would have caused this vehicle
14     to go to the left, did he?
15 A.  I don't have an opinion one way or the other on
16     that.  I don't have the opinion that it was a
17     lock-up of the brakes as an example that caused
18     it to go to the left.
19 Q.  It's your understanding of having investigated
20     other accidents where there were tread
21     separation events, that there would have been
22     noise and vibration imparted to the vehicle,
23     correct?
24 A.  At some time, yes.
25 Q.  Uh-huh.  Define for me if you would what loss

Page 133

1      of control means.
2  A.  Yes.  It's a situation where the driver is
3      unable to decide an effective choice of
4      [pat|path] that the vehicle is taking.
5  Q.  So the driver is no longer able to decide --
6  A.  And affect the change of course, or perhaps
7      it's braking for that matter also.
8  Q.  Decide and affect a change?
9  A.  Yes.  A desired change in direction of path or
10     speed.
11 Q.  So a driver is no longer able to decide and
12     affect a desired direction change in path of a
13     vehicle?
14 A.  Correct.
15 Q.  Okay.  Where on Exhibit 36 is Mr. Below no
16     longer able to decide and affect a desired
17     direction and change of path of his vehicle?
18 A.  Certainly at position A, and probably before
19     that, but I don't have any other information to
20     place him on the drawing other than at the
21     start of the tire marks.
22 Q.  So certainly at position A, he has then lost
23     control and he's not going to regain it?
24 A.  Correct.
25 Q.  The reason the vehicle got into position A is a

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 134

1    result of at least one left steer input by
2    Mr. Below, correct?
3  A.  Well, it's his response to the tire failure.
4    I'd say it's the tire failure, and now we've
5    talked about him trying to control the vehicle
6    from the tire failure.
7        But yes, I would say there's some
8    steering input to the left.
9        MR. TAYLOR:  I need to object to
10   everything except yes as nonresponsive.
11  Q.  The vehicle at position A on Exhibit 36 would
12   not have been in that position but for a left
13   steer input, correct?
14       MR. ROGERS:  Object to the form.
15  A.  I can't say that's a fact, no.
16       MR. TAYLOR:
17  Q.  Would -- But for a left steer input and/or
18   braking in your opinion, right?
19       MR. ROGERS:  Object to the form of the
20   question.
21  A.  If you're taking that snippet at A?
22       MR. TAYLOR:
23  Q.  Yes.
24  A.  I would say that indicates some turning to the
25   left and perhaps some braking.

Page 135

1  Q.  Both driver reactions, correct?
2  A.  Yes.
3  Q.  Did you measure the side force capability of
4    the right rear tire in either inflated or
5    uninflated condition?
6  A.  No.
7  Q.  And you're not going to offer any opinions as
8    to the severity or the magnitude of any pull to
9    the right on this vehicle as a result of the
10   tread separation event, correct?
11  A.  As to numbers, no, I'm not.
12  Q.  Are you going to quantify it in any other
13   manner?
14  A.  We've already talked about it's my opinion
15   there's some drag.
16  Q.  Right.
17  A.  But I haven't given any numbers.  I don't know
18   any numbers.
19  Q.  Okay.  I may have asked you this.  I apologize
20   if I have.  And I'm not trying to see if you
21   answer the same way like that other lawyer did
22   you were telling me about.
23  A.  Right.
24  Q.  Let me ask a clean question.  Do you have an
25   opinion, sir, as to where in the accident

Page 136

1    sequence the right rear tire lost its air
2    pressure?
3  A.  Like I said, I didn't know exactly when it lost
4    its air pressure.  So no.  The answer again is
5    no.
6  Q.  You're not going to offer the opinion that the
7    subject vehicle was defectively designed,
8    correct?
9  A.  You're correct.  I am not going to.
10  Q.  Do you believe that the subject vehicle as it
11   was loaded on the date of this accident was
12   unstable?
13  A.  No.  I don't believe it was unstable.
14  Q.  What's the basis of that opinion?
15  A.  Well, it had been driven.  Seemed to me that it
16   would be stable in the sense that it's a pickup
17   truck pulling a trailer.  I understand there's
18   load on it, but I don't know exactly what the
19   load is.  But there was no report by the
20   passenger of any instability.
21       There was no report by the witness
22   behind that somehow the trailer was swinging
23   back and forth before this event occurred.
24  Q.  And that's a good point.  How would instability
25   have manifested itself based on the loading of

Page 137

1    this vehicle?
2  A.  Well, if we had -- You're asking a
3    hypothetical.  If you had, let's say, too much
4    weight on the trailer -- rear of the trailer
5    and not enough tongue weight, and you could
6    have then a situation where the trailer would
7    move side to side, that would be -- manifest in
8    observations made by others of the way that it
9    was being pulled.  The driver would sense that
10   as far as a trailer contributing to
11   instability.
12       If you're talking about the pickup
13   itself, certainly going around corners, if the
14   truck was unstable, there would be excessive
15   leaning, potential tipping over at that
16   location.
17       I didn't see any sign from any facts
18   I've seen in this case that the pickup by
19   itself or with the attached trailer was
20   unstable.
21  Q.  Did you do any analysis of the handling or
22   steering properties of the GMC pickup involved
23   in this accident with four good tires?
24  A.  No.
25  Q.  Can you quantify for us the understeer gradient

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 138

1    of the subject vehicle with four good tires on
2    it?
3    A.   No.
4    Q.   Are you aware of whether or not the subject
5         vehicle would transition to an oversteer
6         vehicle with a right rear tire failure?
7    A.   Do I know?
8    Q.   Yes, sir.
9    A.   No.  I don't know.
10   Q.   Have you ever been in a vehicle as a driver or
11        passenger that suffered a tread and top belt
12        detachment?
13             THE COURT REPORTER:  Tread?
14             MR. TAYLOR:
15   Q.   Detachment?  Tread and top belt detachment?
16   A.   No.
17   Q.   Have you ever been present for any testing
18        where tread and top belts have been purposely
19        detached from passenger vehicles?
20   A.   No.
21   Q.   Have you performed any computer simulations of
22        this accident?
23   A.   No.
24   Q.   Have you done any animations of this accident?
25   A.   No.

Page 139

1    Q.   Do you intend to?
2    A.   No.
3    Q.   Have you ever worked for a company or
4         government agency that has responsibility for
5         overseeing any aspect of safety related to
6         passenger vehicles or their component parts?
7    A.   No.
8    Q.   Ever worked for an automobile manufacturer?
9    A.   Not as a direct employee, no.
10   Q.   Have you testified as an expert on behalf of
11        vehicle manufacturers in the past?
12   A.   I have.
13   Q.   Which ones?
14   A.   General Motors, it was Jeep AMC at that time.
15        I've had some work with Ford.  There probably
16        was a Volvo in my past.
17             Those would be the names that come to
18        mind.
19   Q.   Which particular Ford product were you
20        defending?
21   A.   I wasn't defending the product.  Was
22        reconstructing the accident.
23   Q.   Did you ever defend a GM product from
24        allegations of defect?
25   A.   As I told you before, I worked with Professor

Page 140

1    Easton early on, we had some Corvair cases, and
2    I worked with Professor Easton and there's
3    some allegations about the Corvair being
4    defective.
5    Q.   Fair enough.  Other than the Corvair?
6    A.   Talking passenger cars, I'd say probably not.
7         I don't recall one.
8    Q.   How about Ford or Volvo; did you defend them
9         against allegations of design or manufacturing
10        defect?
11   A.   In the Ford cases, those were reconstructions,
12        and the Volvo I believe was too.
13   Q.   Have you been asked to testify at trial?
14   A.   No.
15   Q.   Does most of your work occur in the state of
16        Wisconsin?
17   A.   Right now probably, yes.
18   Q.   How long has that been the case?
19   A.   Probably the last -- Well, it started out
20        originally back in -- 46 years ago it was
21        mostly Wisconsin.
22   Q.   Sure.
23   A.   But then I've been in just about every state,
24        three countries.
25             But right now I would say mostly the

Page 141

1    Midwest and Wisconsin.
2    Q.   In those other cases where you had done
3         reconstructions of accidents involving tire
4         failures, were all of those steel-belted radial
5         tires, or were some of those also bias-ply
6         tires?
7    A.   Excuse me.  I have not testified in all those
8         places or analyzed in all those places failures
9         of tires.  I thought you were talking about
10        accident reconstruction analysis work.
11   Q.   I was.
12   A.   I don't recall any -- Maybe there was one in
13        Iowa back when the Firestone steel-belted tires
14        were failing where I did some reconstruction
15        work, but I don't recall any in some other
16        state other than Wisconsin.
17   Q.   And let's break it down a little bit.  I think
18        what you told me earlier was that you had
19        investigated some 20 or 30 other accidents in
20        your history that involved some type of tire
21        failure event?
22   A.   Correct.
23   Q.   And what I want to know now is, of those 20 or
24        30 investigations that you conducted related to
25        tire failures, if they were all steel-belted

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 142

1   radial tires, all bias-ply tires, or some
2   combination of those two?
3   A.  I simply don't remember.  I know I did some
4       reconstruction work on when the Firestone
5       steel-belted tires were separating, but I --
6       I'd say -- Well, early on we still had some
7       bias-ply tires.  But most of my work is
8       concentrated on whether there was a nail in the
9       tire or  something of that nature, rather than
10      ply separations.
11          So whether they were steel-belted or
12      not I simply don't remember, other than the
13      Firestone tires.  I remember some of those.
14  Q.  Right.  Did the Firestone tires fail by tread
15      and top belt detachment?
16  A.  By what?
17  Q.  Tread and top belt detachment?
18  A.  Not that I recall.  But that was -- I didn't
19      analyze the reason for the failures.  I was
20      involved in the reconstructions of the
21      accidents.
22  Q.  I understand.  And in part of your analysis of
23      the reconstruction, would you look at how the
24      tire may have failed, by what means?
25  A.  Generally, yes.

Page 143

1   Q.  Or mode?
2   A.  But that was not my area.  Usually the tires
3       were then sent to other people to analyze.
4   Q.  Fair enough.  Just like in this case, somebody
5       else is going to tell the ladies and gentlemen
6       of the jury on behalf on the Plaintiffs why
7       they believe the tire came apart the way it
8       did, correct?
9   A.  I expect so.
10  Q.  Not you?
11  A.  Not me.
12  Q.  That is not your job?
13  A.  That's right.
14  Q.  Okay.  My point is, I want to talk to you about
15      accident reconstructions where you've been the
16      accident reconstructionist and part of the
17      analysis was that there was a tire event
18      involved.  Okay?
19  A.  Yes.
20  Q.  Of those, can you tell us how many have
21      involved a tread and top belt detachment as we
22      see in the tire in this case?
23  A.  No.
24  Q.  When you gave me the number of 20 or 30 earlier
25      in your deposition, did you mean to imply that

Page 144

1   there were 20 and 30 other cases that you had
2   investigated where a tire had failed by tread
3   and top belt detachment?
4   A.  No.  And perhaps it was 30 to 40.
5       MR. ROGERS:  Correct.
6       MR. TAYLOR:
7   Q.  Sorry.
8   A.  These were totally -- You asked about tire
9       failures, and I don't remember too awful many
10      other than the Firestone where it was ply and
11      tread separation.
12  Q.  Okay.
13  A.  But I don't have a number in mind.
14  Q.  Other than the Firestone tires back in the
15      early 2000s that may have failed by tread and
16      top belt detachment and you investigated an
17      accident following that, do you recall any
18      other manufacturers -- tire manufacturers that
19      would have been involved in any of the other
20      accidents you investigated?
21  A.  No.
22  Q.  Do you have any criticisms of Mr. Beauchamp's
23      analysis in this case?
24  A.  To the parts I evaluated that pertain to what
25      I've done and to the degree that I could

Page 145

1   ascertain what he did, no.  His speed
2   calculation was 55 to 63 miles per hour.  I
3   don't know the methodology he applied, but the
4   results are similar to mine.
5       The whole other topics that he
6   discussed I didn't -- I don't recall one way or
7   the other to comment accordingly.  But on the
8   reconstruction aspects, his drawing looks like
9   my drawing.  His speed calculations are very
10  similar to mine.  Or I should say the results.
11  I don't know what he did in detail to arrive at
12  the same top number that I did.
13  Q.  But purely talking about how the vehicle moved
14      through these tire marks, the number of rolls
15      and the speed calculations, that analysis from
16      Mr. Beauchamp is very similar to your analysis?
17  A.  Yes.
18  Q.  How and why the vehicle became oriented in that
19      particular position is where you guys would
20      differ, is that correct?
21  A.  I haven't studied enough in detail.  He has a
22      number of opinions related to the tire failure
23      and what the vehicle does, and I haven't
24      analyzed that to that degree other than what
25      we've -- other than what I've responded to in

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 146

1       your questions today.
2   Q.  Sure.
3   A.  So I can't comment on his report further.
4   Q.  Okay.  And that's what I'm getting to, is I
5       need to understand at the time of trial, are
6       you going to come in and offer any additional
7       opinions as to any effect the failure of the
8       right rear tire may have had on the handling
9       and controllability of Mr. Below's pickup
10      truck, other than what we talked about so
11      far?
12  A.  No.
13  Q.  Have you consulted with any of the other
14      experts that have been retained by Mr. Below's
15      attorneys as to their opinions on the effect
16      the right rear tire failure may have had on the
17      handling and stability of the Below pickup
18      truck?
19  A.  No.
20  Q.  You would agree that a tread separation on a
21      right rear tire on a 2005 GMC pickup truck such
22      as this could be a controllable event?
23  A.  It's a possibility, yes, I agree.
24  Q.  Did I ask you if you were going to offer any
25      opinions on warnings?

Page 147

1   A.  You did, and I'm not.
2   Q.  And you said no.  Okay.  Good.
3   A.  Cross off another page, please.
4   Q.  How about we take a break?  Mind if we go off
5       the record?
6   A.  No.  I don't mind at all.
7           MR. TAYLOR:  Great.
8           THE VIDEOGRAPHER:  Going off the
9       record at 12:13 p.m.
10          (A break was taken from 12:13 to
11      12:33.)
12          THE VIDEOGRAPHER:  We are back on the
13      record at 12:33.
14          MR. TAYLOR:
15  Q.  Mr. Skogen, are you ready to continue?
16  A.  Yes, sir.
17  Q.  Great.
18          Do you know anything about whether the
19      radio was on in the vehicle just prior to the
20      accident?
21  A.  No, sir.
22  Q.  Do you know anything about where Mr. Below's
23      hands were on the steering wheel just prior to
24      the accident?
25  A.  No.

Page 148

1   Q.  Do you know anything about Mr. Below's cell
2       phone use just prior to the accident?
3   A.  No.
4   Q.  With regard to the speeds of the vehicle as it
5       was traveling down I-94 westbound, can you tell
6       the ladies and gentlemen of the jury any speed
7       that Mr. Below may have been traveling prior to
8       the first tire mark?
9   A.  Depends whether or not I consider with the
10      witness that was following said.
11  Q.  Uh-huh.
12  A.  If we're just talking about the physical facts,
13      the answer is no, not without further
14      assumptions.
15          If we go by what the witnesses would
16      indicate, yes, I could.
17  Q.  The physical facts are what you told us you
18      believe his speeds were at the time of the
19      first tire mark, correct?
20  A.  Correct.
21  Q.  Other than that, you've got a witness that was
22      traveling behind him who estimated his speed,
23      is that right?
24  A.  Yes.
25  Q.  And do you know the qualifications of that

Page 149

1       individual to estimate speeds?
2   A.  I don't know if it's qualifications.  I
3       remember the statement that the witness who was
4       in the left lane was in the process of passing
5       Mr. Below's truck.  So I don't know about
6       qualifications to make an observation that
7       the witness who was passing was going faster
8       than Mr. Below.  Beyond that I have no
9       response.
10  Q.  In terms of how fast Mr. Below had traveled
11      while going down Interstate 94 prior to that
12      witness coming behind him, do you have any
13      information about that?
14  A.  No.
15  Q.  Do you have any information with regard to the
16      care and maintenance of the subject vehicle?
17  A.  No.
18  Q.  Do you have any information with regard to the
19      care and maintenance of the subject tire?
20  A.  No.
21  Q.  Are you going to drive on the interstate today,
22      sir?
23  A.  No.
24  Q.  Do you sometimes drive on Interstate 94?
25  A.  Yes.  I'll be driving on it tomorrow.

DENNIS D.   SKOGEN, MSME - 10/13/2016

1  Q.  When you're driving on Interstate 94, will you
2      be wearing your seat belt?
3  A.  Yes.
4  Q.  Do you consider your seat belt use to be a
5      prudent thing to do?
6  A.  Prudent might be a legal term, and I'll defer
7      to others on that.  But I consider it a safe
8      thing to do.
9  Q.  Do you consider wearing a seat belt a safe
10     thing to do?
11 A.  Yes, I do.
12 Q.  Do you make people riding in your vehicle wear
13     their seat belts?
14 A.  Well, to the degree that I can make them.  My
15     children certainly have to wear their seat
16     belts, and I highly recommend and suggest
17     strongly that who's ever a passenger in my
18     vehicle wears their seat belt.  But I'm not
19     sure I can make them wear their seat belt.
20 Q.  I won't pull away from a curb unless
21     everybody's belted.  Will you?
22 A.  I have done so, yes.
23 Q.  Is that a safe thing to do?
24         MR. ROGERS:  Object to the form.
25 A.  Pull away from the curb without people all

1      wearing their seat belts?
2         MR. TAYLOR:
3  Q.  Yes, sir.
4  A.  I certainly consider it a safe thing to do.
5  Q.  We already talked about that you can't tell us
6      the distance from position A on Exhibit 36
7      where the subject tire began to fail, is that
8      correct?
9  A.  Yes.
10 Q.  Do you have any opinion as to how long in time
11     it was prior to the vehicle being at position A
12     that the subject right tire began to fail?
13 A.  Not without further information, I do not.
14 Q.  As the vehicle appears in position A on
15     Exhibit 36, do you believe the right rear tire
16     at that point had lost all of its tread and top
17     belt?
18 A.  No.  I don't have an opinion one way or the
19     other in that regard.
20 Q.  Do you have an opinion one way or the other
21     where in the accident sequence the right rear
22     tire lost all of its tread and top belt?
23 A.  No.
24 Q.  Are you aware of any other opinions that you
25     intend to offer at the time of trial that I

1      have not asked you about today?
2  A.  No.
3  Q.  Have you told me the basis of all of the
4      opinions that you do intend to offer at the
5      time of trial?
6  A.  Yes.
7         MR. TAYLOR:  With that I will reserve
8      the remainder of my questions till the time of
9      trial, and I will pass the witness.
10        E-X-A-M-I-N-A-T-I-O-N
11 BY MR. ROGERS:
12 Q.  I just have a clarification question, sir.
13     During your investigation and work on this
14     case, did you make a determination as to when
15     the accident sequence began in this crash?
16 A.  Yes.
17 Q.  And what is that?
18 A.  When the tire failed, the right rear tire
19     failed.
20        MR. ROGERS:  That's all I have.  Thank
21     you.
22        E-X-A-M-I-N-A-T-I-O-N
23 BY MR. TAYLOR:
24 Q.  And you can't tell us where the right rear
25     tire -- Strike that.  You can't tell us

1      where in space or in time the right rear tire
2      began to fail, is that correct?
3  A.  Well, not the exact location.  Of course not.
4      But I can tell you it was further to the east,
5      and it's sometime before location A.  I don't
6      have enough information without making some
7      assumptions or having further input as to the
8      area both in time or distance before
9      position A.
10 Q.  And can you tell us any conditions that may
11     have been manifesting on the tire itself prior
12     to its ultimate failure?
13 A.  No.
14 Q.  You certainly don't know what caused the
15     subject tire to fail, right?
16 A.  Well, that wasn't my area of analysis.  So the
17     answer is no, I don't.
18 Q.  All right.
19 A.  Not without information from someone else or
20     assumptions being made.
21 Q.  Sure.  And based on the laws of physics as you
22     understand them with the right rear tire
23     failure on the Below vehicle, it would have
24     been pulled to the right, is that correct?
25 A.  I don't know about it being the laws of physics

DENNIS D.   SKOGEN, MSME - 10/13/2016

Page 154

1   per se, but it's been my experience that that's
2   what initially would occur with the right rear,
3   there would be a tendency for the vehicle to go
4   to the right initially.
5   Q.   Sure.  And that the only way it would get back
6        to the left would be with a steer input and/or
7        a braking of the vehicle, correct?
8             MR. ROGERS:  Object to the form.  It's
9        incomplete.
10  A.   There could be some other ways, but those would
11       be the most common ways.
12            MR. TAYLOR:
13  Q.   What other ways is it going to get back to the
14       left?
15  A.   We talked about that before.  If you go off on
16       the shoulder, the coefficient on the right side
17       is lower than on the left side, so there would
18       be some pulling back to the left.  We can talk
19       about drop-off of the edge of the roadway.
20            There are a number of ways it could go
21       back to the left.
22  Q.   Sure.
23  A.   Steering is the most common way.
24  Q.   Fair enough.  In this accident sequence, is
25       there any indication that the vehicle went off

Page 155

1        the roadway to the right?
2   A.   No.
3   Q.   Is there any indication other than a steer
4        and/or braking by Mr. Below that put the
5        vehicle in the leftward position that we find
6        it at point A on Exhibit 36?
7             MR. ROGERS:  Object to the form.
8   A.   Not of which I'm aware, no.
9             MR. TAYLOR:  Okay.  That's all I have.
10       We're off the record.
11            THE VIDEOGRAPHER:  This concludes the
12       deposition of Dennis Skogen on October 13th,
13       2016.  Off the video record at 12:41 p.m.
14            (Proceedings ended at 12:41 p.m.)

Page 156

1   STATE OF WISCONSIN)
2                     ) SS:
3   MILWAUKEE COUNTY  )
4             I, DOREEN M. BROWN-SCHWAGER, a Notary
5   Public in and for the State of Wisconsin, do hereby
6   certify that the above deposition of DENNIS SKOGEN,
7   was taken before me, on October 13, 2016, at the
8   offices of Habush, Habush & Rottier, 150 East Gilman
9   Street, Madison, Wisconsin, commencing at 9:05 a.m.
10            That it was taken in machine
11  shorthand by myself, and that the foregoing
12  proceedings constitute a full, true, and correct
13  transcription of my original machine shorthand notes
14  taken at said hearing.
15            That said deponent, before
16  examination, was duly sworn to testify the truth,
17  the whole truth, and nothing but the truth relative
18  to said cause.
19
20            Dated this 20th day of October, 2016.
21
22
23
24
25  My commission expires November 2, 2018.

Page 157

2                      ERRATA SHEET
3
4
5   I declare under penalty of perjury that I have read the
6   foregoing _____ pages of my testimony, taken
7   on _____ (date) at
8   _____(city), _____(state),
10  and that the same is a true record of the testimony given
11  by me at the time and place herein
12  above set forth, with the following exceptions:
13
14  Page  Line  Should read:              Reason for Change:
15
16  ___  ___  _____     _____
17  ___  ___  _____     _____
18  ___  ___  _____     _____
19       _____     _____
20  ___  ___  _____     _____
21       _____     _____
22  ___  ___  _____     _____
23       _____     _____
24  ___  ___  _____     _____
25

DENNIS D.   SKOGEN, MSME – 10/13/2016

Page 158

```
1                    ERRATA SHEET
2    Page  Line  Should read:              Reason for Change:
3
4    __  __   _____   _____
5             _____   _____
6    __  __   _____   _____
7             _____   _____
8    __  __   _____   _____
9             _____   _____
10   __  __   _____   _____
11            _____   _____
12   __  __   _____   _____
13            _____   _____
14   __  __   _____   _____
15            _____   _____
16   __  __   _____   _____
17
18
19   Date: _____
20
             _____
21              Signature of Witness
22
             _____
23              Print Name of Witness
24
25
```